## BRYAN & Others *v.* KENNETT & Others.

IN ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MISSOURI.

Argued December 12, 1884.—Decided January 5, 1885.

The term "property," in the treaty by which the United States acquired Louisiana, comprehends every species of title, inchoate or complete, legal or equitable, and embraces rights which lie in contract, executory as well as executed.

The incomplete title acquired from the Spanish government, prior to the treaty of St. Ildefonso between Spain and France, to lands in the territory now embraced within the State of Missouri, was such a property interest as could be transferred by mortgage or reached by judicial process.

Congress intended by the act of February 14, 1874, 18 Stat. 16, entitled "An Act to confirm certain titles in the State of Missouri," to recognize the claim of Austin arising from the Spanish concession, survey, and grant recited in its preamble, and to assure those who were in possession, by contract or by operation of law, and, therefore, assignees of Austin, that they would not be disturbed by any assertion of claim upon the part of the United States.

Questions involved in the determination of a suit in equity are not open to re-examination, in any collateral proceeding between the same parties or their privies, if the court rendering the decree had jurisdiction of the subject-matter and of the parties.

This action, in form ejectment, involved the title to an undivided half of a tract of land in the county of Washington, State of Missouri, containing six hundred and forty acres, part of a larger tract, containing seven thousand one hundred and fifty-three arpents, or six thousand and eighty-five acres, known as the Mine à Breton survey, or as United States survey, numbered 430, made in the name of Moses Austin, and dated August 14 and 15, 1817. In conformity with the instructions of the court, the jury returned a verdict for the defendants.

The plaintiffs in error, who were plaintiffs below, introduced in evidence a certified copy of the foregoing survey; also a certified copy of a recorded deed of February 15, 1820, by Moses Austin and wife, whereby the grantors bargained, sold, and conveyed to James Bryan, Levi Pettibone, and Rufus Pettibone, as tenants in common—one undivided half to Bryan and an undivided fourth each to the other grantees—"the whole of that certain tract of land heretofore granted to the said Moses Austin by the Spanish government, and confirmed to him by the government of the United States, containing 7,160 arpents, and being one league square, situated at and near the Mine à Breton, in the county of Washington and Territory aforesaid [Missouri,] being the only concession from the Spanish government to the said Moses Austin," &c.; excepting from such conveyance, several parcels, aggregating about

2,500 arpents, and which the grantor had previously conveyed to other persons.

The deed also provided that the grantor would not warrant and defend the premises against a judgment for about $14,000, which the Bank of St. Louis had obtained in the Superior Court of the Territory against him, for which debt that bank held, in addition, a mortgage on part of the premises conveyed; nor against three judgments in favor of Gamble's estate for about $1,029; nor against a judgment in favor of Alexander McNair, for about $450.

They also read in evidence an act of Congress, approved February 14, 1874, 18 Stat. 16, as follows:

"CHAP. 29. An act to confirm certain land titles in the State of Missouri.

"Whereas the Baron of Carondelet, governor-general of the Territory of Louisiana, did, on the fifteenth day of March, anno Domini seventeen hundred and ninety-seven, instruct Zenon Trudeau, lieutenant-governor of said Territory, to place Moses Austin in possession of a league square of land at Mine à Breton, in said Territory; and

"Whereas the said Moses Austin did, in the year anno Domini seventeen hundred and ninety-eight, take possession of the said land by moving upon it with his family, and did improve the same by building dwelling-house, blacksmith shop, furnace, and other improvements; and

"Whereas the said lieutenant-governor did, on the fourteenth day of January, seventeen hundred and ninety-nine, order Antone Lulard, surveyor in said Territory, to survey the said land and put the said Austin legally in possession of the same, which survey, numbered fifty-two, containing seven thousand one hundred and fifty-three arpents and three and two-thirds feet, was executed by said Antone Lulard, and a certificate of the same filed by him in November, anno Domini eighteen hundred; and

"Whereas Don John Ventura Morales, then governor at New Orleans, did, in the year of our Lord eighteen hundred

and two, in the name of the King of Spain, grant to the said Moses Austin the land so surveyed and located : Therefore,

"*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the United States hereby release whatever title they have to said lands now numbered four hundred and thirty on the plat in the surveyor-general's office, and in townships thirty-seven and thirty-eight, range two east, in the county of Washington and State of Missouri, containing seven thousand one hundred and fifty-three and thirty-two one hundredths arpents (six thousand eighty-five and twenty-nine one hundreths acres), to the heirs, legal representatives, or assigns of said Moses Austin, according to their respective interests therein: Provided, however, that this act shall not affect nor impair the title which any settler or other person may have acquired adverse to the title of said Moses Austin to any portion of said land."

They also proved that James Bryan, one of the grantees in the deed of February 15, 1820, intermarried in 1813 with Emily M. Austin, a daughter of Moses Austin. There were five children of that marriage, one of whom, Stephen, was born July 16, 1814, and died in the succeeding month. Three others, the present plaintiffs, were born, respectively, December 14, 1815, September 25, 1817, and January 12, 1821 ; while the remaining one, Elizabeth, was born in 1822 and died in 1833. Moses Austin died in 1821 and James Bryan in 1822. The widow of the latter intermarried in 1824 with James F. Perry, of which marriage there were five children, two of whom died in infancy during the lifetime of their parents, two others died without having been married, while the remaining one died in 1875, leaving several children. The surviving children of these two marriages, and their descendants, are the only living descendants of Moses Austin.

Upon the foregoing evidence the plaintiffs rested their case.

The defendants offered in evidence a duly certified copy of the order of Baron de Carondelet, dated March 15, 1797, to Zenon Trudeau. This paper not being found in the files of

the court could not be made a part of the bill of exceptions; but its import is shown by the preamble of the foregoing act of Congress.

. They also read in evidence the following documents:

1. A copy, certified under the hand and seal of the register of lands for the State of Missouri, of "the plat of survey No. 52, containing 7,153 arps. $32\frac{2}{3}$ p's, in the right of Moses Austin, as the same appears of record in first part of registre d'arpentage, page 85, Soulard's surveys, together with field-notes of the same;" and a copy of the record of the grant to Austin, under date of July 5, 1802, by "Don John Bonaventure Morales, treasurer of armies, intendant interim of the royal finances of the provinces of Louisiana and Western Florida, superintendent, sub-delegate, judge of arrivals, of lands, and King's domain," whereby was granted to Austin "complete property, use, and domain of the aforesaid 7,153 arpents $32\frac{2}{3}$ feet of land in superficie, according to the results of figures and measures contained in the plat of survey drawn by said Soulard," &c. This was accompanied by a copy of the testimony taken in 1808 in support of Austin's claim, from which it appeared that he took possession of the land embraced in that grant as early as 1798 and made improvements thereon. 18 Amer. State Papers (3 Public lands), 682. 2. The claim of Austin, as set out by him upon the United States record of land titles.

The defendants introduced a large amount of other documentary evidence, which, in the view taken by the court of the case, it is unnecessary to give in detail. Its object was to show the execution of a mortgage, under the date of March 11, 1818, by Austin to the Bank of St. Louis, on the land in controversy, for the sum of $15,000; a judgment in the Superior Court of the Territory of Missouri, in favor of the bank against Austin for $14,001.85, rendered October 1, 1819 and a judgment in the same court, in favor of McNair, for $493,94; executions upon those judgments issuing in 1819, which were levied upon all the right, title, claim, interest, and property of Austin in the land embraced in the Mine à Breton survey (except three lots of described boundaries), and under which sales

were had March 21, 1820; a deed by the sheriff, making the sale to Charles R. Ross, who purchased as agent of the Bank of St. Louis, and to which no seal or scroll was affixed; duly recorded deeds from the bank to Charles R. Ross in trust; from Ross to Simpson, Price, Hammond, and Easton; from Simpson, Hammond, and Easton to Price; from Ross, agent, to Price; from Price to Smith and others in trust; from the latter, under date of June 29, 1822, to Louis Devotion; the death of Devotion, and the appointment and qualification of Savage and Walsh as his administrators; the resignation of Walsh, and the sale by Savage, as administrator, because of the insufficiency of personalty to meet debts of his intestate, and in conformity with the orders of the County Court of St. Louis County, having jurisdiction in the premises, of Austin's interest in the land embraced in the Mine à Breton survey; its purchase by John Deane; the confirmation of such sale; and the subsequent conveyance to Deane by the administrator of Devotion on May 28, 1835.

On the first day of April, 1836, Deane, having received possession under his purchase, exhibited his bill in equity in the Circuit Court of Washington County, Missouri, against James F. Perry and Emily, his wife; Stephen Perry and Eliza Perry; the present plaintiffs in error; and a child, whose name was alleged to be unknown, but who was averred to have been born of the intermarriage of James F. and Emily Perry. The bill alleged that the defendants were out of the jurisdiction of the court, and residents of the State of Texas; and that all of them, except James F. Perry and wife, were under the age of twenty-one years. It gave a detailed history of the title asserted by Deane under the before-mentioned proceedings, alleging, among other other things, that the sheriff who made the deed for the land sold in 1820 under the foregoing executions, inadvertently and by mistake omitted to affix a seal or scroll thereto; that the deed from Austin to James Bryan was without consideration, and was made with the intent, upon the part of Austin and Bryan, to hinder and delay the creditors of the grantor; and that Bryan took the conveyance with knowledge of and subject to the judgments and mortgages held against

Austin by the Bank of St. Louis and McNair. The prayer of the bill was, that the defendants in that suit, in whose behalf an interest in the land was asserted, be compelled by a decree of court to answer to the complainant for all the right, title and interest each of them might have in the undivided moiety of the said tract of land, or "that the right, title and interest of James Bryan, at the time of his death, and of said James F. Perry and Emily, his wife, in her right, and of the said William Bryan, Moses Bryan, Guy Bryan, Stephen Perry, Eliza Perry, and the child, whose name is unknown, of the said Emily Perry, in the said undivided moiety of the said tract of land conveyed by said Moses Austin, by his deed, executed the fifteenth of February, 1820, to said James Bryan as aforesaid, be vested in your orator, and for such other and further relief as to the court shall seem just," &c.

The bill was verified by the oath of the complainant, and he also made affidavit that the defendants (naming them), and the child, whose name was unknown, of the said Emily Perry, defendants in the bill, were non-residents of the State of Missouri.

On the 26th of July, 1836, an order was made by the court reciting that the order of publication, previously made by the clerk in vacation, had been duly published, and a guardian *ad litem*, John Brickey, was appointed in behalf of the infant defendants. On the next day, an order was made reciting that the infant defendants—naming them—come "by their guardian, John Brickey, and file their answer; and the said James F. Perry, and Emily, his wife, having been notified to appear at this term, according to law, and answer the bill of the said complainant, or the same would be taken as confessed, and having failed to file any exceptions, plea, demurrer or answer to the bill, it is ordered that the same be taken as confessed against the said James F. Perry and his wife." It was further ordered and adjudged that the right, title and interest of Perry and wife in the undivided moiety of the land conveyed by Austin's deed of February 15, 1820, to James Bryan, "be vested in the said John Deane, the complainant, unless the said James F. Perry and wife appear at the next term of this court and file their answer to said bill."

On the 30th day of November, 1836, the following decree was passed:

" And now at this day comes the said John Deane, the complainant, by his solicitor, and the said William Bryan, Moses Bryan, Guy Bryan, Stephen Perry, Eliza Perry, and a child, whose name is unknown, of the said Emily Bryan, defendants, by their guardian, John Brickey, and by agreement of the parties aforesaid, it is consented that the bill be taken in lieu of allegations, and thereupon, neither party requiring a jury, all and singular the premises are submitted to the court, who doth find that the matters aforesaid, in form aforesaid in the bill alleged, are true; and the said James F. Perry and Emily, his wife, having failed to appear at this term of the court and file their answer to the bill of complaint, it is ordered and adjudged and decreed that the decree heretofore entered in this cause against them be, and the same is hereby, made final.

" And it is further ordered, adjudged, and decreed that the right, title, and interest of the said William Bryan, Moses Bryan, Guy Bryan, Stephen Perry, Eliza Perry, and a child, whose name is unknown, of the said Emily Bryan, defendants, in and to the undivided moiety of that certain tract of land situate in the county of Washington, in this State, heretofore granted to Moses Austin by the Spanish Government, and confirmed to him by the Government of the United States, containing seven thousand one hundred and sixty arpents, and being one league square, situate at and near the Mine à Breton in the county of Washington, excepting such parcels thereof as the said Moses Austin had prior to the fifteenth day of February, in the year one thousand eight hundred and twenty, sold and conveyed, and which parcels so excepted are, fourteen hundred and thirty-two arpents to John Rice Jones, forty-five arpents to the county of Washington, two hundred and sixteen arpents to a Mr. Perry, two hundred and forty-three arpents to a Mr. Ruggles, fifty-eight arpents to a Mr. McGready, four arpents to John Brickey, senior, three hundred and twenty-four arpents to Mr. Ficklin, forty-five arpents to Mr. McCormick, one hundred and sixteen arpents to Mr. Brocky, and are described in the deeds and contracts to said purchasers for the same,

being the moiety conveyed as charged in the bill of complaint by Moses Austin to James Bryan, by his deed dated the fifteenth day of February, in the year one thousand eight hundred and twenty, be vested in the said John Deane the complainant.

" And it is further ordered, adjudged and decreed that the said defendants recover of the said complainant, John Deane, the costs and charges in this behalf expended.

" And it is further ordered, adjudged and decreed that the said William Bryan, Moses Bryan, Guy Bryan, Stephen Perry, Eliza Perry, and a child, whose name is unknown, of the said Emily Bryan, respectively, be allowed each the time of six months after he or she respectively comes of age to appear and show cause against this decree entered as aforesaid against them."

The present action was defended upon the following grounds: 1. That the defendants and those under whom they claim had been in the open, continuous adverse possession of the premises in controversy for more than thirty years prior to the commencement of the action. 2. That the equitable title to the premises emanated from the government of the United States on the 10th of April 1803 ; that the premises have not been in possession of the plaintiffs, or of any one under whom they claim, for a period of time exceeding thirty years prior to February 27, 1874, nor have plaintiffs, during that period, paid taxes thereon, but they have been paid by defendants and those under whom they claim ; that on the 10th day of June, 1814, all title, both legal and equitable, to said premises passed from the United States, and that no action to recover the same has been instituted, as provided by law, prior to the institution of the present suit. 3. That the decree in the equity suit instituted on the 1st day of April, 1836, by John Deane, who then had actual possession of the premises, and under whom the defendants claim, estops the plaintiffs from maintaining their action and from claiming under the deed from Moses Austin to James Bryan, Levi Pettibone, and Rufus Pettibone any interest or estate in the premises adverse to said defendants.

Without any reference to the defence based upon adverse

possession, the jury were instructed to find, and did find, a verdict for the defendants. A general exception was taken by the plaintiffs to the "instructions" given by the court. Judgment was rendered on the verdict. The plaintiffs sued out this writ of error.

*Mr. Henry H. Denison* for plaintiffs in error.—I. Austin had no title in the league square, Mine à Breton, which could be subjected to levy and execution. This court has held that the act of March 26, 1804, annulled all grants included in the treaties made subsequent to the treaty of St. Ildefonso. *Foster* v. *Neilson*, 2 Pet. 253, affirmed in *Garcia* v. *Lee*, 12 Pet. 511; *United States* v. *Reynes*, 9 How. 127; *United States* v. *D'Auterine*, 10 How. 609; *United States* v. *Philadelphia and New Orleans*, 11 How. 609; *De Montault* v. *United States*, 12 How. 47; *United States* v. *Lynde*, 11 Wall. 632. Those who come in under a void grant can acquire nothing. *Polk's Lessee* v. *Wendell*, 5 Wheat. 293; *United States* v. *Arredondo*, 6 Pet. 691, 731; *Sampeyreac* v. *United States*, 7 Pet. 222, 241.—II. If the act of April 12, 1814, embraced the Morales grant, it could only confirm the equitable title. The legal title still remained in the government. *Papin* v. *Hines*, 23 Missouri, 274.—III. But the Austin claim was not confirmed by that act. *Burgess* v. *Gray*, 16 How. 48.—IV. It was essential to the validity of an execution issuing out of the Superior Court that it should be under a seal purporting to be the seal of the Superior Court for the Circuit. On this point the counsel quoted sundry laws of Missouri.—V. The executions under which the sale of the Mine à Breton survey was made were without seals, and void. A levy of a void execution is void, especially when made on lands which the judgment debtor held by a void concession. Until an inchoate title be confirmed it has no standing in a court of equity. *Burgess* v. *Gray*, 15 Missouri, 220; *Insurance Co.* v. *Hadlock*, 6 Wall. 556. VI. The sheriff's sale was further void as an attempt by the bank by means of a levy and execution to deprive a mortgagor of his equity of redemption and of his rights under the mortgage contract. *McNair* v. *O'Fallon*, 8 Missouri, 188. A judgment brought collaterally before the

court, may be shown to be void upon its face. *Webster* v. *Reid*, 11 How. 437; *Albee* v. *Ward*, 8 Mass. 79; *Miller* v. *Handy*, 40 Ill. 448.—VII. The sheriff's deed to Ross was void for want of seal. *Moreau* v. *Detchemendy*, 18 Missouri, 522. A court of equity cannot relieve against this defective execution. *Bright* v. *Boyd*, 1 Story, 478. See also *Moreau* v. *Branham*, 27 Missouri, 351; *Grimsley* v. *Riley*, 5 Missouri, 280; *Walker* v. *Keile*, 8 Missouri, 301; *Harley* v. *Ramsey*, 49 Missouri, 309.— VIII. The sheriff's deed is also void for want of seal to the clerk's certificate. *Allen* v. *Moss*, 27 Missouri, 354; *Alden* v. *King*, 35 Missouri, 216; *Adams* v. *Buchanan*, 49 Missouri, 64; *Ryan* v. *Carr*, 46 Missouri, 483; *Hammond* v. *Coleman*, 4 Missouri, App. 307.—IX. The deed of Price to Ross is inoperative and void. The doctrine is well settled, in relation to solemn instruments under seal, that the principal will only be bound where he is both in form and substance the contracting party. It must be his deed. If it be the deed of the agent only, it will neither pass the title of the principal, nor bind him as a covenantor. *Townsend* v. *Corning*, 23 Wend. 435. See also *Wood* v. *Goodridge*, 6 Cush. 117; *Thurman* v. *Cameron*, 24 Wend. 87. The addition to his name of the words " Attorney of Henry L. Sheldon" was a mere *descriptio personœ*. The fact that in truth he was the attorney or *procurador* of Sheldon cannot, by the most liberal interpretation, impart to the instrument executed by Chase the character of a conveyance by Sheldon. Chase might as well have described himself as of any other profession or occupation belonging to him as that of attorney of Sheldon. *Echols* v. *Cheney*, 28 Cal. 157. See also *Harper* v. *Hampton*, 1 H. & J. 622, 709; *Elwell* v. *Shaw*, 16 Mass. 42; *Barger* v. *Miller*, 4 Wash. C. C. 280; *Bobb* v. *Barnum*, 59 Missouri, 394. Not being under the corporate seal of the bank it is void.—X. It follows that Price, holding under a void deed, and having no title, could convey none. *Hiney* v. *Thomas*, 36 Missouri, 377; *Elliott* v. *Peirsol*, 1 McLean, 11.—XI. The notice on non-resident minors in *Deane* v. *Bryan* was insufficient.—XII. Brickey's consent as guardian that the allegations of the bill might be taken as confessed against non-resident minor defendants was made without

power. *Litchfield* v. *Buswell*, 5 How. Pr. 341; *Revely* v. *Skinner*, 33 Missouri, 98.—XIII. No decree can be taken against a minor on his own admissions or those of his guardian ad litem.

*Mr. George D. Reynolds* for defendant in error.

Mr. Justice Harlan delivered the opinion of the court. He recited the facts, as above stated, and continued:

The objection that the record does not show a sufficient exception, upon the part of plaintiffs, to the instructions given to the jury, cannot be sustained. The series of propositions announced by the court, although styled instructions, embodies nothing more than the reasons that induced it to direct a verdict for the defendants. These propositions submitted no fact for the determination of the jury; for, they were accompanied by a peremptory instruction to return a verdict for the defendants. As the bill of exceptions contains all the evidence, and, in addition, sets forth the exceptions reserved by the plaintiffs, in the progress of the trial, to the admission of testimony, it is competent for this court to determine whether the exceptions were well taken, and, also, whether there was error in directing a verdict for the defendants. If, upon all the evidence, excluding such as was incompetent, plaintiffs were entitled to go to the jury—and such is the contention here—there was error of law in instructing them to find for the defendants. We proceed, therefore, to consider such of the questions argued by counsel as are deemed necessary to the determination of the case.

By an act of Congress, approved April 12, 1814, ch. 52, 3 Stat. 121, provision is made for the confirmation of the claims of every person or persons, or the legal representatives of any person or persons, claiming lands in the State of Louisiana, or the Territory of Missouri, by virtue of any incomplete French or Spanish grant or concession, or any warrant or order of survey, which was granted prior to the 25th of December, 1803, for lands lying within that part of the State of Louisiana which composed the late Territory of Orleans, or which was

granted for lands lying within the Territory of Missouri before the 10th day of March, 1804. In behalf of the plaintiffs it is contended that the Spanish grant of 1802, recited in the preamble of the act of February 14, 1874, was void, because made subsequent to the treaty of St. Ildefonso, concluded October 1, 1800, between Spain and France; Act of March 26, 1804, 2 Stat. 287, ch. 38, § 14; *Foster* v. *Neilson*, 2 Pet. 253, 304; that, if the grant to Austin was an incomplete grant, and, therefore, embraced by the act of 1814, that act operated only to confirm to him the equitable title to the land, the legal title remaining in the United States until the passage of the act of February 14, 1874; that the equitable title passed only under the restrictions and in the manner prescribed by the act of 1814; that, so far from Austin acquiring the legal title, the board of commissioners, organized under the act of Congress, found that his title was not a grant made and completed prior to the treaty of St. Ildefonso, 17 American State Papers (2 Public Lands), 678; 18 Ib. (3 Public Lands), 671; *Burgess* v. *Gray*, 16 How. 48; that, for these reasons, Austin did not, at the date of the before-mentioned judgments, have any title which could be mortgaged or which was subject to levy and sale under execution; and, consequently, that all the proceedings which had for their object to acquire or reach his interest in the Mine à Breton survey are inoperative to defeat their rights under the act of February 14, 1874, by which, for the first time, the United States parted with the legal title.

It is not necessary, in this case, that we should define the precise nature and extent of the interest acquired by Austin in this land, prior to or apart from the grant of 1802 by Morales, then governor at New Orleans. The order of the governor-general of the Territory of Louisiana, in 1797, that he be placed in possession; his taking possession of the land and improving it in 1798; the orders of the lieutenant-governor of the Territory, in 1799, that the land be surveyed and Austin put legally in possession, followed by the execution of that order, and the recording of the certificate of survey—all prior to the treaty of St. Ildefonso—certainly operated to give Austin a property

interest in the land, capable (even if the grant of 1802 was void) of being made a complete grant, with the consent of the United States. In *Soulard* v. *United States*, 4 Pet. 511, it was said by Chief Justice Marshall, that, in the treaty by which Louisiana was acquired, the United States stipulated that the inhabitants of the ceded territory should be protected in the free enjoyment of their property; that the term "property," as applied to lands, comprehends every species of title, inchoate or complete, and embraces rights which lie in contract, executory as well as executed; and that, in this respect, the relation of the inhabitants to their government was not changed; the new government taking the place of that which had passed away. In *Strother* v. *Lucas*, 12 Pet. 410, 434–5, which involved the title to real estate in St. Louis, the court said that "the State in which the premises are situated was formerly a part of the territory, first of France, next of Spain, then of France, who ceded it to the United States by the treaty of 1803, in full propriety, sovereignty and dominion, as she had acquired and held it, 2 Pet. 301; by which this government put itself in place of the former sovereigns and became invested with all their rights, subject to their concomitant obligations to the inhabitants;" that "this court has defined property to be any right, legal or equitable, inceptive, inchoate or perfect, which, before the treaty with France in 1803, or with Spain in 1819, had so attached to any piece or tract of land, great or small, as to affect the conscience of the former sovereign 'with a trust,' and make him a trustee for an individual, according to the law of nations, of the sovereign himself, the local usage or custom of the colony or district; according to the principles of justice and rules of equity;" and that "the term 'grant,' in a treaty, comprehends not only those which are made in form, but also any concession, warrant, order, or permission to survey, possess or settle, whether evidenced by writing or parol or presumed from possession." So in *Hornsby* v. *United States*, 10 Wall. 224, 242, it was said that by the term "property," as applied to lands, all titles are embraced, legal or equitable, perfect or imperfect. See also *Carpenter* v. *Rannels*, 19 Wall. 138, 141; *Morton* v. *Nebraska*, 21 Wall. 660.

And in *Landes* v. *Perkins*, 12 Missouri, 238, the court said: "It is a matter of history, of which this court will take judicial notice, that, at the time of the cession of Louisiana to the United States, in that portion of the territory of which this State is composed, nineteen-twentieths of the titles to lands were like that involved in this case prior to its confirmation. There were very few complete grants. Most of the inhabitants were too poor to defray the expenses attending the completion of their titles, but they had faith in their government and rested as quietly under their inchoate titles as though they had been perfect. As early as October, 1804, we find the legislature speaking of freeholders and authorizing executions against lands and tenements. There being so few complete titles, the legislatures, in subjecting lands and tenements generally to execution, must have contemplated a seizure and sale of those incomplete titles which existed under the Spanish Government. At the date of the act above referred to, no titles had been confirmed by the United States. An instance is not recollected in which a question has been made as to the liability of such titles as Clamorgan's under the Spanish government to sale under execution. It is believed that such titles have been made the subject of judicial sales without question ever since the change of government."

That such was the law of Missouri is recognized by this court in *Landes* v. *Brant*, 10 How. 348, 370–1, where, among other things, referring to a title derived from the Spanish government, and confirmation of which was obtained from a board of commissioners, acting under the authority of the United States, it was said: "The imperfect title as then filed was subject to seizure and sale by execution; the ultimate perfect title demanded and granted was a confirmation and sanction by the political power of the imperfect title, and gave it complete legal validity."

We are of opinion, therefore, that, even upon the assumption that the Spanish grant of 1802 was void, the interest which Austin acquired by the concession of 1797, the order of survey, and the recorded survey of 1799, in connection with his actual possession, taken under competent authority, was a property

right which, at least as between private parties, could be transferred by mortgage or be reached by judicial process.

But it is contended that the defendants cannot claim title under the before-mentioned proceedings in the courts of the Territory and State of Missouri, and thereby defeat the rights of the plaintiffs under Austin's deed of 1820, because: 1. It was not competent for the bank to have Austin's interest sold under execution on a judgment, while it held a mortgage on part of the premises sold, and thus cut off his right of redemption; 2. The sheriff's deed to Ross was void for want of a seal or scroll affixed thereto. 1 Terri. Stats. Missouri, 120, § 45; *Moreau* v. *Detchemendy*, 18 Missouri, 522; *Allen* v. *Moss*, 27 Missouri, 354; *Moreau* v. *Detchemendy*, 41 Missouri, 431; *Grimsley* v. *Riley*, 5 Missouri, 280; *Harley* v. *Ramsey*, 49 Missouri, 309; 3. The deed from the bank was not under its corporate seal; and these matters all appearing upon the face of the record in the suit of *Deane* v. *Bryan*, instituted in 1836, no title passed by the decree therein, even if the court rendering it had jurisdiction. These propositions were necessarily involved in the determination of that suit, and, so far as they impeach the correctness of that adjudication, are not open to re-examination, in any collateral proceeding between the same parties or their privies, provided the court which rendered the decree had jurisdiction of the subject-matter and of the parties.

Its jurisdiction to pass any final decree affecting the rights of non-resident minors is assailed only upon grounds to be now stated.

1. It is contended that there was no authority, under the laws of Missouri, to proceed against the non-resident minors by publication. Counsel for the plaintiffs refers to the act of March 17, 1835, regulating the practice at law in the courts of Missouri, and calls attention to the fact that, while it provides for actual service of process upon infants, no provision is made for service upon non-resident defendants by publication. And referring to the act of March 7, 1835, regulating the practice in chancery, he insists that, while a mode is therein prescribed for the service of process upon resident and non-resident de-

fendants, no provision is made for service on non-resident minors. It is not questioned that, under the laws of Missouri, adult non-resident defendants in equity suits concerning real estate, may be proceeded against by publication in such cases as that instituted by Deane in 1836; but it is contended that non-resident infants could not be brought before the court in that mode. In this view we do not concur. It appears from the Missouri statutes, that the court which determined Deane's suit was a court of record, having exclusive original jurisdiction, in the county in which it was held as a court of equity, "in all cases where adequate relief cannot be had by the ordinary course of proceedings at law," with authority "to proceed therein according to the rules, usage and practice of courts of equity, and to enforce their decrees by execution, or in any manner proper for a court of chancery;" also, that "suits in equity concerning real estate, or whereby the same may be affected, shall be brought in the county within which such real estate, or a greater part thereof, is situate," and, in any county, "if all the defendants are non-residents;" and further, that "in all cases where the court may decree the conveyance of real estate, or the delivery of personal property, they may, by decree, pass the title of such property without any act to be done on the part of the defendants, when in their judgment it shall be proper; and may issue a writ of possession, if necessary, to put the party entitled into possession of such real or personal property, or may proceed by attachment or sequestration." Rev. Stat. Mo. 1835 (2d Edit. 1840), Title "Courts," p. 155; Ib. Title "Practice in Chancery," art. 1, §§ 1 and 2; art. 6, § 7.

By the same statute, provision is made for proceeding against defendants who are non-residents of the State, by publication, where the complainant, or any one for him, files with his bill an affidavit, stating their non-residence. Upon such affidavit being filed, the court, or the clerk, in vacation, was authorized to make an order, directed to such non-residents, notifying them of the commencement of the suit, stating the substance of the allegations and prayer of the bill, and requiring them to appear on a day to be therein named (allowing sufficient time

for publication) and answer the same, or the bill will be taken as confessed. Rev. Stat. Mo. 1835, Title " Practice in Chancery," art. 1, § 7. Similar proceedings were prescribed as to persons interested in the subject-matter of the bill, whose names appeared, from the verified allegations of the bill, to be unknown to the complainant. Ib. §§ 10, 11. While our attention has not been called to any statute of Missouri in force when Deane's suit was instituted, which, in terms, authorized publication against non-resident minors, there was no exception in their favor from the provision which permits that mode of bringing non-resident defendants before the court. They could be proceeded against by publication whenever the statute permitted such process against adults. 1 Daniell Ch. Prac. 164, 659, ch. 15, § 2. The provision authorizing courts of equity to proceed according to the rules, usage and practice of courts of chancery, had reference to the rules and practice which obtained in the English courts of chancery. *Ruby* v. *Strother*, 11 Missouri, 417; *Hendricks* v. *McLean*, 18 Ib. 32; *Creath* v. *Smith*, 20 Ib. 113. In conformity with that practice, the court, in the case of *Deane* v. *Bryan*, appointed a guardian *ad litem* to defend the suit for the non-resident infant defendants. 1 Daniell Ch. Prac. 160 to 163. And the record shows that he made defence.

2. But it is claimed that the decree was based upon the admissions by the guardian *ad litem* of the truth of the allegations of the bill, and was, for that reason, void. Without stopping to comment upon the authorities which counsel cite in support of this position, some of which hold that decrees *pro confesso* against infants are erroneous, not that they are subject on that ground to collateral attack as void, it is sufficient to say that the decree under examination was not of the character stated. The contention to the contrary rests entirely upon the recital in the decree, that, "by agreement of the parties . . . it is consented that the bill be taken in lieu of allegations." The meaning of those words is shown by reference to the before-mentioned act regulating the practice in chancery, by which it is provided, that, "within such time as the court shall require, before the hearing of a cause at issue, each party

shall set down distinctly the allegations made by him and denied by the other party, or which, by the course of proceedings in chancery, he is required to support by his testimony, and issues shall be made thereon accordingly, Rev. Stat. Mo. 1835, Title "Practice in Chancery," art. 3, § 1 ; that the testimony shall be confined to the issue thus made, Ib. § 2 ; and that "the trial of all issues and matters of fact shall be by jury, or, if neither party require a jury, by the court, and the allegations shall be disposed of by a general or special verdict before a final decree shall be made, except such as shall be expressly decided by the court to be immaterial or irrelevant to the merits of the cause." Ib. § 5. The consent given was, not that the court might take the allegations of the bill to be true, but only that the "bill be taken in lieu of allegations," thereby dispensing with the requirement of the statute that the complainant should formally "set down" the material allegations of his bill. The effect of the consent was to place the complainant under the necessity, imposed by statute as well as by the established rules in equity practice, of proving every allegation of fact necessary to authorize a decree against the non-resident infants. Nothing was confessed by the guardian *ad litem*, but, a jury being waived, the court found the matters alleged in the bill to be true, and decreed accordingly. That the evidence upon which the court acted does not appear in the record, is, perhaps, because the suit was heard upon oral testimony in connection with the official documents and records referred to in the bill. Ib. § 7.

We have, then, a final decree of a court of superior general jurisdiction, rendered in a suit that involved the title to a tract of land, embracing the premises in controversy, and situate in the county in which the court was held ; in which suit the present plaintiffs, as non-resident minors, were parties defendant, having been brought, in the mode prescribed by the local law, before the court, by publication, and having made defence by guardian *ad litem* duly appointed, and by which decree it was adjudged that the right, title, and interest of the present plaintiffs and others, in the said tract, be vested in the complainant Deane, under whom the present defendants hold pos-

session. The decree, as we have seen, passed the title without any conveyance from the non-resident defendants, for, by its terms whatever title they held was vested in the complainant Deane. According to the settled principles of law, the plaintiffs are thereby estopped from asserting, in this collateral proceeding, any interest in the premises in controversy adverse to that of the defendants. It is not subject to collateral attack, because there is nothing on the face of the record which shows any want of jurisdiction in the court that rendered it. It was and is conclusive as to all the parties to that suit, and their privies, until reversed or modified on appeal, or unless, in proper time, it had been impeached, in some direct proceeding, and set aside or annulled.

One other question remains to be considered. Upon the supposition that Austin took nothing by the grant of 1802, and at most had but an equitable interest in the land, capable of being enlarged into a complete title in the mode prescribed by the acts of Congress, the plaintiffs claim that the rights of the United States were unaffected by any proceedings between private persons involving Austin's title; and, consequently, that the legal title passed to them under that clause of the act of February 14, 1874, which releases whatever title the United States may have, "to the heirs, legal representatives, or assigns of said Moses Austin." In other words, that the decree in 1836 does not preclude them from accepting from the government the legal title to the premises in controversy. We have seen that the property interest of Austin, whatever it was, passed, before the act of 1874, under valid judicial proceedings, to others than the present plaintiffs. If Congress intended to pass the title of the government to the heirs simply, there was no necessity to include his "legal representatives or assigns." But there could have been no such intention; for it was common knowledge, as it was the settled law, that such inchoate interest or title as Austin acquired from the Spanish government, prior to October 1, 1800, could, as between private persons, be transferred or reached by judicial process. We concur with the court below in holding that Congress intended, by the act of 1874, to recognize the claim of Austin arising from the

concession, survey and grant recited in its preamble, and to release to the assignee of such claim the remaining title (if any such there was) of the United States. And those who purchased, under the proceedings referred to, were assignees within the meaning of the act. There was no purpose to disturb their title or possession. On the contrary, the sole object of this legislation, so far as it may be ascertained from the debates in Congress, was to assure those who thus acquired possession, whether by contract or by operation of law, that they would not be disturbed by any assertion of claim upon the part of the United States. It originated with the representatives in Congress from Missouri, whose avowed purpose was to protect the interests of their immediate constituents. The necessity of this act arose from a then recent opinion of the Commissioner of the General Land Office, that the legal title to the land within the Austin claim was still in the United States. In order to quiet the fears of those " who have been in possession for half a century, claiming the land adversely against everybody, as well as the United States," the act of 1874 was passed. It had no other object. Cong. Rec., Vol. 2, Pt. 1, 43d Cong., 1st Sess. 1874, pp. 716, 910.

There is no error in the record, and

*The judgment is affirmed.*