**HEROLD v. COMMISSIONER OF INTERNAL REVENUE.**

No. 5766.

Circuit Court of Appeals, Fifth Circuit.

Aug. 8, 1930.

Rehearing Denied Sept. 10, 1930.

DAWKINS, District Judge, dissenting in part.

S. L. Herold, of Shreveport, La. (Sumter Cousin, of Shreveport, La., on the brief), for petitioner.

G. A. Youngquist, Asst. Atty. Gen., Sewall Key, Helen R. Carloss, and Andrew D. Sharpe, Sp. Assts. to the Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and R. N. Shaw, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for respondent.

Before BRYAN and FOSTER, Circuit Judges, and DAWKINS, District Judge.

BRYAN, Circuit Judge.

This is a petition to review a decision of the Board of Tax Appeals which rejected petitioner's claims that he was entitled, under section 214(a)(10) of the Revenue Act of 1921, 42 Stat. 241, to deductions from his net income during the years 1921 and 1922 for depletion of an oil and gas lease based on the fair market value thereof at the date of discovery of oil, and held him liable for deficiencies assessed by the Commissioner of Internal Revenue upon his net income during those years without making any allowance for such depletion.

The above-cited section of the 1921 Revenue Act provides that in computing net incomes derived from oil and gas wells a reasonable allowance shall be made for depletion where the fair market value of the property is materially disproportionate to the cost, the depletion allowance to be based upon such value at the date of discovery or within thirty days thereafter, and to be equitably apportioned between the lessor and lessee. The lease in question was acquired during 1919 in unproven territory by a partnership composed of petitioner and several others, including George O. Baird. In August, 1919, the partnership drilled a well and discovered oil. The Commissioner of Internal Revenue recognized its right under the Revenue Act to a discovery revaluation, and ascertained the unit for depletion purposes to be $1.3859 per barrel. In December 1919 Baird, who for convenience held the title in his name, acting for himself and his associates, contracted to sell the lease to one Flannery for $2,500,-000. Flannery made a net cash payment of $350,000, which was duly returned by members of the partnership for income tax purposes; but failed to make any of the deferred payments. Because of Flannery's default, at the suit of Baird, who remained in possession, a state court on November 9, 1921, entered a judgment ordering the resolution or annulment of the contract with Flannery, the judgment to become effective only upon restitution to Munhall, Flannery's assignee, of the $350,000 cash payment with interest from the date thereof. On November 16, 1921, Baird and the Gulf Refining Company entered into a contract upon which the rights of the parties depend. That contract is copied in full in the findings of fact by the Board. 17 B. T. A. 933. In substance it provides that the Gulf Company shall take possession of the lease, and at its own expense operate wells, maintain production so long as oil may be produced in paying quantities, pay all taxes, retain 40 per cent. of the oil produced, out of which it shall pay a ⅛ royalty to the original lessor, and a 1/24 royalty to Baird for three years; declares that the Gulf Company has lent to Baird $350,000 on the sole security of the lease and without any personal liability on his part, that, to secure the repayment of that sum, Baird mortgages all his interest in the lease, and pledges all the oil that may be produced except the royalty oil above mentioned; but notwithstanding the mortgage and pledge the Gulf Company binds itself to deliver to Baird 60 per cent. of the oil produced until the expiration of thirty months, or until he shall have received therefrom $325,000. Upon the happening of either event, the Gulf Company is given the right to apply such 60 per cent. of the oil to the repayment of the loan without interest. Baird agreed that when the aggregate of these two amounts, or $675,000, had been realized from the proceeds of oil he would "sell, assign, convey and deliver to the said Gulf Refining Company of Louisiana the entirety of said mineral lease," that company to continue to operate the lease so long as it was able to produce oil therefrom in paying quantities, and to pay to him a 1/24 royalty for three years and thereafter a 1/32 royalty. The contract further declared that Baird had executed an assignment to the Gulf

Company of his entire interest in the lease to be deposited in escrow until the latter had complied with its obligations, and then to be delivered to it. Upon the execution of that contract the Gulf Company paid $350,000 to Munhall, took physical possession of the lease, and complied with all its obligations; and the deed deposited in escrow was later delivered to it. Each member of the Baird partnership, including petitioner, returned as income in 1921 his proper proportion of 60 per cent. of ⅞ of production, deducting depletion based upon discovery revaluation as previously allowed by the Commissioner; and each of them made a similar return for 1922, deducting discovery depletion based upon the 1919 allowance per unit or barrel.

The decision of the Board was based upon the conclusion that the Gulf Company's contract, which petitioner contends was a mortgage of the lease and a pledge of the oil, or a sublease, amounted in law to a sale of the lease, and the Board thereupon held that the initial payment of $350,000 made by the Gulf Company constituted taxable income in 1921, and that petitioner was not entitled to claim deductions for depletion as to 60 per cent. of the oil produced under the contract and sold during the taxable years 1921 and 1922.

 We are of opinion that the contract in question did not provide for a mortgage or pledge. Either of such instruments presupposes a promise or an obligation to pay, and the mortgagor or pledgor gets his property back upon paying the secured debt. But here Baird assumed no liability, and it was not intended or contemplated that he could ever again claim title, possession, or control of the lease. The Gulf Company was in no sense a creditor, but discharged a judgment lien upon the property as a condition precedent to the right to take possession under the contract. It agreed to be liable for interest to Munhall, but to forego interest for itself, thus indicating that it paid Munhall on its own account and not for Baird. Nor in our opinion was there any sublease. The argument for a sublease is based upon Baird's right to royalty, which it is said was rent; but that right existed after as well as before the delivery of the deed placed in escrow. Clearly, rent was not contemplated after delivery of the deed, and no different right was given to Baird before its delivery. The royalty to Baird formed part of the purchase price paid for his interest. Waller v. Commissioner Internal Revenue (C. C. A. Fifth Circuit, opinion filed May 16, 1930) 40 F.

(2d) 892. In that case we considered Smith v. Sun Oil Co., 165 La. 907, 116 So. 379, relied on by petitioner, and held that in Louisiana royalty was not always to be considered as rent. And Wilkins v. Nelson, 155 La. 807, 99 So. 607, also holds that royalty may form a part of the consideration paid for mineral rights. We are unable to agree with the Board that Baird made a sale of the lease and received therefrom $350,000 upon which he became liable in 1921 for an income tax. Baird was not obliged by the judgment of the state court to pay off the Munhall lien. It is true that only by doing so could he get a clear title, but that lien stood against the property and was taken up by the Gulf Company without any right to get it back from Baird in the absence of an agreement, and, as we have already stated, the contract provided, not that the lien should be discharged by Baird, but that the Gulf Company should be reimbursed only out of oil which it took from the wells. The contract declares that Baird had mortgaged the lease and pledged the oil, but it was put in that form apparently for the purpose of making it appear that there had been no sale in order that Baird might not be held liable for income tax at a higher rate of taxation. As it appears to us, what Baird did was to make an assignment of his interest in the lease to the Gulf Company subject to the lien in favor of Munhall, and to secure from the Gulf Company an agreement to pay him for his interest the sum of $325,000 and a royalty. The intention of the parties is not to be controlled by the use of the words "loan," "mortgage," and "pledge," but is to be arrived at from a consideration of the whole instrument. Heryford v. Davis, 102 U. S. 235, 26 L. Ed. 160. Although the Gulf Company did not in terms agree to pay a purchase price of $325,000 except out of the proceeds of oil which it sold, it did agree to operate the wells and set apart 60 per cent. of the oil until that sum was fully paid, after which it had the right to demand and receive the deed which had been placed in escrow. Its obligation went so far as to pay the money or to exhaust the lease. In our opinion this was a sufficient agreement to pay, especially when it is borne in mind that it was Baird's intention to make the contract assume the form of a mortgage or pledge. The parties were not jointly interested in the lease, for, if that were so, Baird's interest would have remained after as well as before the $325,000 had been paid. The Gulf Company only was interested in the lease, and Baird's only object was to secure payment of the purchase price. The con-

tract, so far as Baird was concerned, was an executed one, and the Gulf Company did not need a deed but could have rested upon its title under the contract upon performance of its obligations.

The conclusion is that petitioner is not liable for income tax on the $350,000 paid in 1919, by the Gulf Company to Munhall, but that he is liable for income tax on the amounts received as payments on the $325,000 in 1921 and 1922 without allowance for depletion.

The petition for review is granted, and the cause remanded for further proceedings not inconsistent with this opinion.

DAWKINS, District Judge (dissenting in part).

I concur in the decision by the majority in this case that there was no liability on the part of petitioner for income taxes upon the $350,000 paid by the Gulf Refining Company to the assignee of J. Rogers Flannery, but respectfully dissent from the conclusion announced with respect to depletion.

Both the decision of the Board of Tax Appeals and the opinion of the majority in this case are based upon the proposition that the taxpayer attempted to couch the agreement in language which would give the appearance of retention of title, while in reality all interest in the lease or minerals passed to the Gulf Company, with the evident purpose, it is said, to gain the advantage of depletion allowed by the statute. However, if what was done was legally permissible, then it could make no difference if one of the purposes was to avoid taxation. City of Dallas v. Higginbotham-Bailey-Logan Co. (C. C. A. 5th Ct.) 37 F.(2d) page 513. Regardless of what the act may be called, the important question, as I see it, is, Did the taxpayer retain such an interest in the oil and its production as to entitle him to depletion within the meaning of the statute and according to judicial interpretation of similar provisions in the revenue laws?

The Sixteenth Amendment permits Congress to lay direct taxes upon income from whatever source derived. It did not grant the power to levy such taxes, but merely removed the requirement in another provision of the Constitution requiring them to be apportioned among the several states according to population. Congress already possessed the power to levy such taxes, subject to the restriction mentioned. Peck v. Lowe, 247 U. S. 165, 38 S. Ct. 432, 62 L. Ed. 1049; Bowers v. Kerbaugh-Empire Co., 271 U. S. 170, 46 S. Ct. 449, 451, 70 L. Ed. 886.

In the case last cited the Supreme Court says that: "Income may be defined as gain derived from capital, from labor, or from both combined, including profit gained through sale or conversion of capital." It goes without saying that capital cannot be taxed under the guise of income. For instance, if the taxpayer buys property, whether it be valuable for minerals or not, and subsequently sells it for the same figure, there is no profit and hence no income to tax. It has been uniformly recognized by the Revenue Acts since the adoption of the Sixteenth Amendment that capital invested in minerals, including discovery value, should be returned to the owner through amortization during production. The Treasury Department at first took the position that no one but the owner of the fee could receive the benefits of depletion with respect to mines, and that it did not apply to a lessee, who did not own the ore but merely the exclusive right of extracting it, either for a given period or until exhausted. The reasoning was that depletion was only intended to apply to the freehold, the possession of which after exhaustion of the minerals reverted to the owner of the fee. However, in the case of Lynch v. Alworth-Stephens Co., 294 F. 190, 192, the Court of Appeals for the Eighth Circuit, through Judge Sanborn, reviewed at length the jurisprudence affecting this provision as applied to mines, and found depletion was not so restricted, but could be claimed by any one with a "property right and interest therein." That case went to the Supreme Court on certiorari, where the contention was stated and disposed of as follows:

"Upon the foregoing facts and under these statutory provisions, the question presented for consideration is whether the relation of respondent to the mines which were the source of its income, was such that it was entitled to deduct from the gross amount of such income a reasonable amount for exhaustion or depletion. Upon the part of the petitioner the contention is that the leases do not convey to the lessee the ore bodies, but are contracts of rental conferring only the right to use and occupy the premises and mine the ore, which, so long as it remains in the ground, is the property of the fee owner. It is therefore insisted that by the extraction of the ore, only the property of the fee owner is depleted and such owner alone is entitled to an allowance therefor. On the other hand, respondent contends that under the leases the lessee, as well as the lessor,

owns a valuable property interest in the mines and by the terms of the statute each is entitled to deduct from gross income a reasonable allowance for depletion, the lessee for exhaustion of the leasehold interest and the lessor for exhaustion of the fee interest as lessened by the interest of the lessee, such deduction to be allowed according to the value of the interest of each in the property, the entire allowance, however, not to exceed the total market value in the mine of the product thereof mined and sold during the taxable year.

"It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits (United States v. Biwabik Mining Co., 247 U. S. 116, 123, 38 S. Ct. 462, 62 L. Ed. 1017); but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. See Hyatt v. Vincennes Bank, 113 U. S. 408, 416, 5 S. Ct. 573, 28 L. Ed. 1009; Ewert v. Robinson [C. C. A.] 289 F. 740, 746–750. And there can be no doubt that such an interest is property. Hamilton v. Rathbone, 175 U. S. 414, 421, 20 S. Ct. 155, 44 L. Ed. 219; Bryan v. Kennett, 113 U. S. 179, 192, 5 S. Ct. 407, 28 L. Ed. 908.

"The general provision in section 12(a), Second, is that the deduction from gross income shall include a reasonable allowance for the 'exhaustion * * * of property.' There is nothing to suggest that the word 'property' is used in any restricted sense. In the case of mines, a specific kind of property, the exhaustion is described as depletion, and is limited to an amount not exceeding the market value in the mine of the product mined and sold during the year. The interest of respondent under its leases in the mines being property, its right to deduct a reasonable allowance for exhaustion of such property, if there be any, during the taxable year results from the plain terms of the statute, such deduction, since the property is an interest in mines, to be limited to the amount of the exhaustion of respondent's interest caused by the depletion of the mines during the taxable year. We agree with the Circuit Court of Appeals (294 F. 194) that: 'The plain, clear, and reasonable meaning of the statute seems to be that the reasonable allowance for depletion in case of a mine is to be made to every one whose property right and interest therein has been depleted by the extraction and disposition "of the product thereof which has been mined and sold during the year for which the return and computation are made." And the plain, obvious and rational meaning of a statute is always to be preferred to any curious, narrow, hidden sense that nothing but the exigency of a hard case and the ingenuity and study of an acute and powerful intellect would discover.'

"It is said that the depletion allowance applies to the physical exhaustion of the ore deposits, and since the title thereto is in the lessor, he alone is entitled to make the deduction. But the fallacy in the syllogism is plain. The deduction for depletion in the case of mines is a special application of the general rule of the statute allowing a deduction for exhaustion of property. While respondent does not own the ore deposits, its right to mine and remove the ore and reduce it to possession and ownership is property within the meaning of the general provision. Obviously, as the process goes on, this property interest of the lessee in the mines is lessened from year to year, as the owner's property interest in the same mines is likewise lessened. There is an exhaustion of property in the one case as in the other; and the extent of it, with the consequent deduction to be made, in each case is to be arrived at in the same way, namely, by determining the aggregate amount of the depletion of the mines in which the several interests inhere, based upon the market value of the product, and allocating that amount in proportion to the interest of each severally considered." Lynch v. Alworth-Stephens Co., 267 U. S. 368, 45 S. Ct. 274, 275, 69 L. Ed. 660.

Section 214(a) of the Revenue Act of 1921, provided:

"That in computing net income there shall be allowed as deductions: * * *

"(10). In the case of mines, oil and gas wells, other natural deposits and timber, a reasonable allowance for depletion * * * *according to the peculiar conditions in each case*, based upon cost * * *; Provided further, that in the case of mines, oil and gas wells, discovered by the taxpayer, on or after March 1, 1913, and not acquired as the result of purchase of a proven tract or lease, where the fair market value of the property is materially disproportionate to the cost, the depletion allowance shall be based upon the fair market value of the property at the date of the discovery or within thirty days thereafter * * *." (Italics by the writer.)

It is thus seen that the statute clearly

commands that, in computing net income, there shall be allowed as deductions, "according to the peculiar conditions in each case," a reasonable allowance for depletion, to be based upon cost, and, in the case of discovery, where the fair market value of the property is materially disproportionate to cost, it shall be based upon the market value of the property at the time of discovery or within thirty days thereafter. It did not say that this depletion should be allowed to those having any particular relation to the property, such as the owner, lessor, or lessee, and, to my mind, clearly intended that it should apply to any one having a property right or interest in the minerals to be extracted, just as was held in the case of Lynch v. Alworth-Stephens Co., supra, with respect to mines. So that, in my opinion, regardless of the contract in the present case, if the petitioner retained a property interest in the oil which was to be produced during the taxing years of 1921 and 1922, he was entitled to depletion.

It must be conceded that the income which was sought to be taxed here was received from 60 per cent. of the production of oil from the wells on the lease during those years and the overriding royalties and from no other source, and that its amount was dependent upon the quantity produced and the price received during that same period. Hence it was bound to be based upon the same varying factors which affected the returns received by both the fee owner and the Gulf Company. It is likewise true that, if the quantity of oil in the ground had been exhausted, the wells had "sanded over," as sometimes happens, or an earthquake had destroyed the pool, the petitioner could and would have received nothing further from the property; or, if it failed to produce enough to pay him in full, he alone would have borne the loss. If, in the course of production, because of low price, lack of market, or otherwise, it had been found necessary or advisable to store the oil produced in tanks in large quantities, say one hundred thousand barrels, and lightning or other fortuitous event had destroyed it, the loss would have fallen upon the petitioner to the extent of 60 per cent. of what was destroyed, as well as his royalty interest. Why? Because the contract provided that he should receive, not money, but the oil itself, until the stipulated percentage had given him $325,000. It is well settled that petitioner and the other interested parties became the owners of the oil when it was brought to the surface, and was reduced to possession, and hence the

risk must necessarily have been his under the contract. The pertinent provision of the agreement showing the nature of petitioner's interest in the oil is as follows: "It is distinctly agreed and understood, however, that the Gulf Refining Company of Louisiana will as hereinabove set out deliver to the said Baird sixty per cent (60%) of the oil produced from the said property, notwithstanding the said mortgage and pledge and free from any claim thereunder, until the said Baird shall have received from the said production sufficient oil to yield him, at the market price prevailing on the date of delivery, and at which price he will be able to sell said oil, the sum of Three Hundred and Twenty-five Thousand ($325,000.00) Dollars, from the 60 per cent (60%) of the oil produced from the said property, which the said Gulf Refining Company of Louisiana has under this agreement obligated itself to deliver."

The best recognized test of whether one has parted with the ownership of a thing is, Will he have to stand the loss if it is destroyed without the fault of any one else? I take it that no one would deny that, if the contract had provided that petitioner should receive 60 per cent. of the oil throughout the producing life of the lease, his interest would have been entitled to depletion, including discovery value. The only difference under this contract was that the quantity of oil which he was to receive should never exceed in value the sum of $325,000, and the time within which he was to get it was limited during the first period to thirty months, and such additional time after the Gulf Company had reimbursed itself the sum paid to Flannery as might be necessary to accomplish that result. In reality, since the contract fixed the ultimate sum which he was permitted to realize from the oil, the basis for calculating depletion was rendered certain instead of being dependent upon the estimated production and life of the field. His right to take the oil and apply it to the satisfaction of this sum, I respectfully submit, cannot be differentiated, either actually or in principle, from that of either the lessor or lessee, nor was the nature of his interest therein, before or after it was brought to the surface, any different from theirs.

It also seems to me the reasonable intention of Congress was that the strong-hearted "wildcatter" should be permitted to reap the benefits of a "lucky strike," by being relieved from paying income taxes upon that additional value which results from the discovery of a new pool. He is expressly permitted to add this to what he has paid for his lease and

to have it returned through annual deductions from the receipts for the oil. If, because of financial weakness or inability to develop the property, an arrangement similar to that in the present case is made with some one able to handle it, he is to be denied this benefit, then the attempted concession becomes a mere shadow. We know, as a matter of common knowledge, that in a large number of instances new oil fields are discovered by men possessing much hope and little capital, and that the strong companies invariably appear on the scene after oil is found. In such circumstances it is quite the common practice for the pioneer to transfer his holdings to the big company for a small amount of cash and a large consideration to be paid in oil, with an overriding royalty, and, whether we call it "paying" the mineral or "retaining" it, to my mind makes no difference. I think we may assume that, in making the provision under consideration, Congress knew that which was commonly known to those familiar with the industry, and that it did not intend to create a situation where only those with strong purses should be the beneficiaries of this concession accorded to discoverers.

It is also fundamental that doubts are to be construed against the taxing power. Hence, in my opinion, we are not justified in holding that, because the statute does not specifically say that one, who retains an interest in the minerals to the extent of receiving a part of them as a consideration for rights transferred to another permitting development, shall continue to receive as an annual deduction from his income sufficient to cover a fair proportion of this recognized capital asset, the right is to be denied. As heretofore pointed out, the statute does not mention specifically any class or relation to the property, but declares that the deductions shall be permitted according to the peculiar circumstances of each case.

"The essence of this provision," says Mr. Holmes, in his work on Federal Taxes (6th Ed.) p. 1102, "is that the owner of mineral deposits, whether freehold or leasehold, shall, within the limitations prescribed, secure through an aggregate of annual depletion and depreciation deductions the return of either (a) the cost of the property, or (b) the value of his property on the basic date, March 1, 1913, plus in either case subsequent allowable capital additions. * * *" The concession with respect to discovery value is, of course, the same as saying that it shall be added to the cost price and returned through depletion as capital. If the discoverer divests himself of the right to receive any part

of the minerals or their proceeds as they are produced, then he loses the right thereafter to take credit, as a return of capital, from what remains for any portion of that which has been conveyed; but as to his interest in what is left, in the proportion which it bears to his original investment, including discovery value, so long as the total of that allowable deduction has not been made, it seems to me both justice and logic require that he should be permitted to draw the same back as a capital asset, at the rate which the statute permits, until the whole of that fraction under his original investment has been returned, or until his right to receive any portion of the minerals themselves ends. Any other course, I think, would defeat the primary purpose of the law which seems to have been to avoid taxing as income either an actual capital investment or its legal equivalent, discovery value.

At all events, I think petitioner is entitled to depletion upon the overriding royalties of a $\frac{1}{24}$ for the first three years and a $\frac{1}{32}$ for the remainder of the life of the lease. These constituted an interest in the lease and its production during the periods mentioned, which cannot in any sense be differentiated from the $\frac{1}{8}$ royalty which was retained by the landowner. The majority opinion denies this right upon the statement that these royalties formed a part of the consideration which petitioner received for what is held to have been a sale of the lease. If so, then the fee owner's royalty must necessarily take the same status, for, whether a bonus was paid or not, the royalty was the principal consideration for the lease. Of course every commutative contract has a consideration, but this of itself does not determine its nature. The fact that the possession was to revert to the landowner after the oil was exhausted was of no importance. That contention was made in the case of Lynch v. Alworth-Stephens Co., supra, and was rejected both by the Court of Appeals and the Supreme Court of the United States. There the right to depletion was claimed by the lessee who had retained an overriding royalty on each ton of ore mined by his transferee or sublessee. The decision of the state court cited by the majority in support of the proposition that the fraction retained as royalty was a part of the consideration (Wilkins v. Nelson, 155 La. 807, 99 So. 607), was one in which the plaintiff was seeking to avail himself of the provisions of the Louisiana Code permitting the revocation of a sale of real property for lesion beyond moiety; that is, where the vendor has not received a consideration

amounting to one-half of its value in money at the time of the sale, the law creates a conclusive presumption of fraud or error. Plaintiff in that case had executed "a sale of the oil, gas and mineral rights in and to and under one hundred and twenty acres of land," but retained the right to receive ⅛ of the oil as royalty if and when discovered. Gas alone was found, and there was no provision for royalties as to it. Of course the law of lesion, by express terms, is confined to "sales of immovable property" (La. C. C., art. 1861), and while the privilege of extracting minerals from the soil is, under the code and jurisprudence of Louisiana, a servitude in the nature of a real right upon immovable property, it does not amount, regardless of the terms of the contract, to a conveyance of the minerals themselves. Frost-Johnson Lumber Co. v. Salling's Heirs, 150 La. 855, 91 So. 207. The court in the case cited by the majority merely found that lesion did not apply to a contract of the kind then under consideration for two reasons: First, because it was not a "sale of immovable property," and, secondly, because neither the value of the minerals nor of the ⅛ royalty retained in the oil, if found, could be determined with any degree of certainty, as of the date of the sale. Incidentally, it was said: "At all events, the hope of royalties entered into and became a part of the consideration which induced plaintiff to part with the mineral rights and this furnishes another reason why the sale cannot be avoided for lesion." Undoubtedly, if oil had been discovered under that contract, the plaintiff or owner of the fee would have been entitled to depletion.

I am also convinced that the contract in this case has all the essentials of a sublease under the law of Louisiana. It is well established by the jurisprudence of the state court that royalty stipulated in a mineral lease, in legal contemplation, is the same thing as rent for the lease of a building or farm; and, if the lessee transfers anything less than the whole of his rights, provides for the payment of additional sums above those which are assumed to the fee holder, with other obligations and penalties in favor of the lessee, and with the provision for forfeiture, either express or implied, upon the failure of the transferee to perform the obligations thus assumed, the transaction becomes one of sublease, regardless of what it may have been styled or the words used to effect the transfer. Board of Commissioners v. Pure Oil Co., 167 La. 801, 120 So. 373; Logan v. State Gravel Co., 158 La. 105, 103 So. 526; Smith v. Sun Oil Co., 165 La. 907, 116 So. 379, 381.

In the last-cited case the Supreme Court of Louisiana quoted approvingly from Taylor on Landlord & Tenant (9th Ed.) as follows:

"And the importance of this distinction consists in this, that, while an assignee is liable to the original lessor for all the obligations of the lessee by virtue of the privity of estate that subsists between them, no action can be maintained by the lessor against the undertenant, upon any covenant contained in the lease, since there is neither privity of estate nor of contract between himself and the undertenant. ＊ ＊ ＊

"An assignment differs from a lease in that, by the latter, the lessor grants an interest less than his own, reserving to himself a reversion; but by an assignment he parts with the whole of his interest in the estate. ＊ ＊ ＊ But it is held that if by the terms of the conveyance, be it in the form of a lease or an assignment, new conditions with a right of entry, *or new causes of forfeiture*, are created, then the tenant holds by a different tenure, and a new leasehold arises, which cannot be treated as an assignment or a continuation to him of the original term." (Italics by writer.)

That a conditional right of forfeiture by operation of law was written into the contract between Baird and the Gulf Company seems perfectly clear. Article 2046 of the Civil Code provides: "A resolutory condition is implied in all commutative contracts, to take effect, in case either of the parties do not comply with his engagement; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution, with damages, or, if the circumstances of the case permit, demand a specific performance."

The contract in the present case was undoubtedly a commutative or mutual undertaking, in which each party assumed correlative obligations. The Gulf Company, for a consideration of 40 per cent. of the oil, bound itself to develope the property until 60 per cent. of production, less the owner's royalty and the overriding royalties retained by Baird, for a period of thirty months or longer, if necessary, to reimburse itself for the amount paid to Flannery, had amounted to $325,000; and that it would deliver an excess royalty of ¼₄ of the oil for three years and a ¹⁄₃₂ for the life of the lease. It was also bound to pay the taxes of whatever nature assessed against the lease, including severance taxes, except upon the royalty interests, which at that time amounted to 2 per cent. of the value of the oil produced. On the other hand,

950

Baird, by operation of law, became bound to maintain the Gulf Company in peaceable possession, to deliver the premises with the improvements thereon in good condition, and to defend·it against the acts of all other persons, including those of the fee owner. La. C. C., arts. 2711, 2712. The only obligation which it assumed towards the original lessor was to deliver to him out of its 40 per cent. "one-eighth of the oil, as provided for in the lease covering said property." Otherwise, all of its promises ran in favor of Baird. In paragraph 4 it was expressly stipulated that the Gulf Company should receive all of the gas, including casing head gas, "subject to such contracts as it may be able to secure from the lessors of said property. * * * " If the transaction had been an assignment, this stipulation would have been unnecessary, for the assignee would have taken all rights of this nature which Baird had under the lease. See authorities cited in Smith v. Sun Oil Co., supra.

Notwithstanding the fact, therefore, that the contract in the case before us did not specifically provide for forfeiture or annulment on the failure of the Gulf Company to deliver the 60 per cent. of the oil and the overriding royalties to Baird, as well as 1/8 to the landowner, the law itself supplied that right just as effectually without its being stipulated. La. C. C. art. 2729.

I shall not attempt to review the civil law authorities differentiating between an assignment and a sublease. This labor has already been performed for us very admirably by the present Chief Justice of Louisiana, in the case of Smith v. Sun Oil Co., supra, which in my judgment cannot be distinguished in principle from the·one now under consideration. In that case the parties used express terms·of assignment, but the court, notwithstanding, found the contract to be a sublease.

For the reasons assigned, I respectfully dissent from the holding that petitioner is not entitled to the depletion claimed.