## Trout *versus* McDonald.

1. A lease which gives the right to take out all the coal beneath a certain surface confers also the right to make all necessary openings to reach the coal.

2. T. made a voluntary conveyance of a farm to his wife in 1867, but remained in possession of the property till his death, in June 1873. In April 1873, he granted to McD. the right to mine coal on a part of this farm. McD. worked a mine under the lease during T.'s lifetime and after his death, with the widow's knowledge. McD. never knew of the existence of this deed till July 1874. It was not recorded till August 1874. After the husband's death his widow received payments of royalty under the lease, but afterwards filed a bill to restrain McD. from entering upon the property to mine coal : *Held* (affirming the court below), that she had ratified and confirmed the lease and was bound by it.

3. Whether she might have avoided the lease after her husband's death was not decided.

4. The fact that a mere "wet-weather" spring might be injured by working the mine is not important. Even if it was a valuable spring, it seems that its destruction, if a necessary incident to mining under the lease, would be *damnum absque injuria.*

November 20th 1876. Before AGNEW, C. J., SHARSWOOD, GORDON, PAXSON and WOODWARD, JJ. WILLIAMS and MERCUR, JJ.; absent.

Appeal from the Court of Common Pleas of *Mercer county :* Of October and November Term 1876, No. 210.

Margaret J. Trout filed a bill in equity against John McDonald, to restrain him from sinking a certain shaft on her land, and from entering thereon, for the purpose of mining coal. The facts were as follows :—

In December 1867, M. C. Trout, the husband of the plaintiff, made a voluntary conveyance of a farm of 100 acres of land in Mercer county to his wife. This deed was not recorded till August

[Trout v. McDonald.]

1874, and McDonald, the defendant, never knew of its existence till July of that year. In April 1873, Trout, by a writing under seal, granted McDonald the "privilege of going on the south end of his farm, near No. 14 school-house, and from thence west to the old barn, and mining and taking out all the coal he could reach beneath the surface," for a royalty of thirty cents per ton, and also "to work the mine in such manner as to do the least possible damage to the land, to fill up all holes made, and to level off all banks and ridges," &c. The plaintiff was present at the execution of this lease, and knew the contents of it. Trout died in June 1873. Up to the time of his death there had been no visible change in the possession of the farm, but the husband remained in possession with his wife till his death, exercising all necessary acts of ownership. The plaintiff did not notify McDonald of her title till July 15th 1874, but, on the contrary, she allowed him to work under the lease, and accepted about $200 from him as royalty thereunder. The defendant had been mining coal through shaft No. 1, under the lease, during Trout's lifetime and after his death, and had sunk also a trial shaft, and when this bill was filed was about to open another shaft, No. 3, upon the property described in the lease, to the northeast of the old barn, and distant from the first shaft about 1000 feet. To restrain the defendant from sinking this shaft, and from entering on her land under the lease, was the object sought by the bill. The bill further alleged probable damage to a spring near shaft No. 3. This spring, however, appeared to be a "wet-weather" spring, of no particular value.

The court below, Maxwell, P. J., made a decree dismissing the bill, from which the plaintiff appealed.

*Magoffin & Tanner*, for the appellant.—McDonald had nothing more than a license to go on the land *near* the school-house, and make a single opening or shaft, and from that to take out coal lying between the school-house and barn.

It cannot be held that Mrs. Trout ratified the lease, as it was not her act, nor the act of her agent. In Brown *v.* Bennett, 25 P. F. Smith 420, the agreement for the sale was the wife's, and the case does not apply.

*W. W. Mason*, for the appellee.

Mr. Justice PAXSON delivered the opinion of the court, January 2d 1877.

There was no clear and distinct finding of the facts by the master in this case. So far as they are stated at all it is done argumentatively. This omission has been supplied by the learned judge of the court below, who has found the facts clearly, and as the evi-

2 NORRIS—10

[Trout *v.* McDonald.]

dence shows, in the main correctly. We may therefore dismiss, without further remark, those of the specifications of error that relate to questions of fact. It remains but to inquire whether the conclusions of law arrived at by the learned judge are correct. Passing by the question, raised by the first assignment of error, as of no possible importance in this case, we have but two prominent questions, viz., 1. Whether by a fair construction of the lease of M. C. Trout to the appellee the latter was confined to one opening; and 2. Whether the appellant was bound by the lease executed by her husband, and if not, whether she is now estopped by her own acts from denying its validity. By the terms of the lease between M. C. Trout and John McDonald, the appellee, the privilege was granted to the latter " of going on the south end of his (Trout's) farm, near No. 14 school-house, and from there west to the old barn, and mining and taking out all the coal he can reach beneath the surface, and removing the same from the premises, &c." McDonald was to pay Trout thirty cents per ton for all coal taken out; to work the mine in such manner as to do the least possible damage to the land; to fill up all holes made, and level off all banks and ridges, so as to leave the surface smooth and natural. The lessee made an opening near No. 14 school-house, and after taking out all the coal he could there mine with profit, made another opening near to, but east of the old barn. It is contended by the appellant that the said opening near the barn was not authorized by the terms of the lease; that said lease contemplated but one opening, and the taking out so much coal only as could be reached therefrom. The language of the lease is not very clear upon this point, but we think there is enough to show the intent and meaning of the parties. The thing for which the parties were contracting was the coal between certain points. It is a fundamental rule, in the interpretation of a deed or lease, that it is to be taken most strongly against the vendor or lessor. Applying this rule to this lease, it seems clear that it gave the lessee the right to mine all the coal that he could reach beneath the surface from No. 14 school-house west to the old barn. We regard the reference to the school-house and barn as merely descriptive of the territory leased and to be mined. There is nothing in the language of the instrument necessarily to restrict the number of slopes or shafts. If we are right in our construction of the lease, that it applied to all the coal between the points referred to, the right to make the necessary openings to reach it would follow by implication, unless restrained by the express words of said lease. It is conceded that as many test holes may be sunk as may be necessary. Why not as many shafts? We do not think that M. C. Trout, were he still living, would have any equity to restrain his lessee from taking out coal from the new slope. Is his wife, the appellant in this case, in any better position? The learned judge of the court below finds as a fact that

[Trout v. McDonald.]

the deed from M. C. Trout to the appellant was purely voluntary; that it was not recorded until more than a year after his death; that the husband remained in possession up to the time of his death, exercising acts of ownership over the property; that the appellant was present when her husband gave the lease to McDonald, the appellee; that she knew its purpose, and did not then, nor until after the 15th of July 1874, inform the appellee of the existence of her deed, much less make any claim to him for the land described in it. It is said, however, that the answer of the appellee does not deny the title of the appellant. This is true to a certain extent. There is no denial of the execution of the deed from M. C. Trout to his wife. But an adverse title is set up to the extent of the lease, derived from M. C. Trout, executed in the presence of the wife, with her knowledge and without any objection from her. All this might not estop the appellant from avoiding the lease after discoverture; but we have the further fact expressly found by the court below, that, "subsequent to her husband's death, when a single woman, and before she notified the defendant from sinking said No. 3 shaft or mine, the plaintiff, with full knowledge that defendant had been mining by virtue of said lease, received from him about $200 royalty to apply on coal so mined." Conceding that the appellant had the right to avoid the lease after her husband's death, here was a deliberate ratification and affirmance of it. It was not done in ignorance of her rights. She knew all about the lease, and it would only have been common justice and common honesty to have notified the appellee of her rights at the earliest moment. Instead of doing so, she withholds her deed from record for a considerable time after her husband's death; allows the appellee to go on with his improvements for some time before she informs him of her claim, and receives $200 royalty for coal mined under the lease. It was then too late for her to repudiate it. It was competent for her to affirm the lease after her coverture had ceased: Brown v. Bennett, 25 P. F. Smith 420.

We do not attach much importance to the matter of the spring. The court below found the fact that it was a mere "wet-weather" spring. Were it otherwise, if its destruction was a necessary incident of mining under the lease, it would be *damnum absque injuria*.

The decree is affirmed; the costs of the appeal to be paid by the appellant.