STANDARD POCAHONTAS COAL CO. v. NEW POCAHONTAS COAL CO.

(Circuit Court of Appeals, Fourth Circuit. July 2, 1918.)

No. 1616.

1. MINES AND MINERALS ⟨=⟩62(1)—MINING LEASES—CONSTRUCTION.
   Leases and agreements as to coal lands *held* to give the lessee and its assignees the right to work all seams of coal under the land included in the demise.

2. ESTOPPEL ⟨=⟩93(8)—EQUITABLE ESTOPPEL—WHAT CONSTITUTES.
   Where the lease and a subsequent agreement gave defendant's predecessor the right to work any coal seams within the property demised, that defendant did not discover lower seams until after their existence was discovered by successors of the lessor on adjacent property *held* not to estop defendant from working such seams; it appearing that defendant in the meantime had been complying with the lease as to the mining of seams already known.

Appeal from the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Bill by the New Pocahontas Coal Company against the Standard Pocahontas Coal Company. From a decree for complainant, defendant appeals. Affirmed.

⟨=⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Malcolm Jackson, of Charleston, W. Va., and Walter C. Merrick, of Cleveland, Ohio (Brown, Jackson & Knight, of Charleston, W. Va., and Hoyt, Dustin, Kelley, McKeehan & Andrews, of Cleveland, Ohio, on the brief), for appellant.

Graham Sale, of Welch, W. Va., and John H. Holt, of Huntington, W. Va. (Holt, Duncan & Holt, of Huntington, W. Va., on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and SMITH, District Judge.

SMITH, District Judge. This case comes up upon an appeal from a decree of the District Court of the United States for the Southern District of West Virginia, filed August 10, 1917. The facts appear to be that on the 30th of November, 1901, a corporation known as the Pocahontas Thin Vein Coal Land Company, in West Virginia, made an agreement with a corporation, also of West Virginia, called the Slick Rock Coal Company. Under this contract the Pocahontas Thin Vein Coal Land Company leased for coal-mining and coal-coking purposes only, to the Slick Rock Coal Company for the period of 30 years from the 1st day of January, 1902, a tract of land in McDowell county, W. Va., containing 306 acres, and giving the particular metes, bounds, and courses of this land. This lease contained the following clause:

"It is mutually understood and agreed, however, that if the lessor shall discover any other workable seam or seams of coal on said tract of land other than the seam that the lessee is now operating, known as the Tug River seam of coal, that it shall offer the same for lease to the lessee upon the terms, conditions, and stipulations herein contained, except as to royalty, which may be such sum as shall be agreed upon by the parties hereto, except that it shall not in any case exceed the amount herein provided, to wit, 8 cents per ton of 2,240 pounds for coal mined, and 15 cents per ton of 2,240 pounds for coke manufactured, from such other vein or veins of coal, unless such other vein or veins be four feet or more in thickness, in which case the royalty shall not exceed 10 cents per ton of 2,240 pounds for coal mined, and 15 cents per ton of 2,240 pounds, for coke manufactured from such vein or veins of coal."

"If the party of the second part does not desire to operate such seam or seams, and does not elect to accept such lease of the same within six months from the time the lessor offers it, upon the terms and conditions herein set forth, then and in that event the lessor shall have the privilege of leasing said seam or seams of coal upon the same terms and conditions that the same were offered to the lessee to any other person, persons, partnership, or corporation, for the purpose of mining coal and manufacturing coke therefrom; but in the event of said seam or seams of coal being so leased to any other person, persons, partnership, or corporation, then said parties so leasing the same shall take said lease subject to all the rights of the lessee hereunder, and shall not be permitted to mine or operate the same so as to interfere with, disturb, or injure the lessee in its operation under this lease."

In paragraph third of the same agreement it is provided that the following royalties shall be paid by the lessee:

"To wit, 8 cents per ton for each and every ton of 2,240 pounds of coal mined, dug, carried away from, or sold or used on the said premises for any other purposes than the manufacture of coke, and fifteen (15) cents for each and every ton of 2,240 pounds of coke manufactured upon the said premises, and sold therein or therefrom."

[1] It will be thus noted in this agreement that after in the first paragraph making a positive lease of a certain described and bounded piece of land, for coal and coke purposes, it proceeds in the second paragraph to practically limit the seam of coal leased by limiting the terms of the grant in the first paragraph and confining the same, so as to lease to the lessee the right to mine only the seam that it was then operating, known as the Tug River seam of coal. If, however, the les-sor (nothing being said about any discovery by the lessee) should dis-cover any other workable seam or seams of coal on the said tract of land, it was obligated to offer a lease of it first to the lessee upon the mentioned terms and conditions, and only if the lessee did not decide to accept the lease within six months from the time of receiving the offer, then the lessor had the privilege of leasing it to any one else, providing that it should be offered to such third party only upon the same terms and conditions as was offered in the first instance to the lessee. On the 4th day of December, 1902, a supplemental agreement was entered into between the same parties, viz., the Pocahontas Thin Vein Coal Land Company and the Slick Rock Coal Company, which provided that the agreement of the 30th of November, 1901, should be modified, first, by changing the provisions of said agreement, so that the royalty paid for coal mined on the premises should be 5 cents per ton in lieu of 8 cents per ton; and, second, that the provision in the contract in regard to any other seams of coal which might be found underneath the seam then being worked should be entirely omitted, and that such seams of coal might be worked by the party of the first part (the lessor) itself, at the same royalty therein provided—that is, 5 cents per ton for each ton of 2,240 pounds.

An inspection of this agreement shows that there is evidently a cleri-cal error in it, where the words used are that such seams of coal may be worked by the party of the first part, viz., the lessor, and the evi-dent meaning of the whole agreement is that what was intended was that such seams might be worked by the party of the second part (the lessee). To give any other construction of this clause would seem very inconsistent with the two agreements taken as a whole. The limita-tion inserted in the first agreement of the 30th of November, 1901, confining the lessee to working only the seam known as the Tug River seam of coal, is entirely withdrawn and obliterated, and the agreement of the 30th of November is therefore left as if the unlimited grant in the first paragraph giving the right to mine coal for coal-mining and coal-coking purposes upon the entire 306 acres was left to the lessee in an unlimited manner; that is, that it could mine any and all seams of coal on the land leased. The provisions following this, that such seams of coal may be worked by the party of the first part (the lessor) at the same royalty therein provided (that is, at 5 cents per ton for each ton of 2,240 pounds), was evidently intended to provide that the party of the second part, to whom was thus given the unlimited right to work all seams of coal that might be within the limits of the leased premises, should, however, work all other seams that might be discovered upon the same royalty (that is, 5 cents per ton), as was provided expressly in the agreement of the 30th of November, 1901, as modified by the

agreement of December 4, 1902, as to coal mined from the seam known as the Tug River seam of coal.

This construction of these agreements is confirmed by the circumstance that on the same day, viz., the 4th of December, 1902, the Pocahontas Thin Vein Coal Land Company entered into an agreement with one James A. Henchey, whereby it leased to Henchey for coal-mining and coal-coking purposes only, for the period of 30 years from the 1st day of January, 1902, a tract of 1,100 acres in McDowell county, W. Va., which it proceeds to describe in particular as being the portion of the tract of land conveyed to the Pocahontas Thin Vein Coal Land Company by John Rapelije and Emily T. Rapelije, his wife, on the 30th of June, 1901, excepting, however, from the 1,100 acres the land leased by the Pocahontas Thin Vein Coal Land Company to the Slick Rock Coal Company by a contract of lease bearing date the 30th of November, 1901. Reading the three deeds together, as evidencing the intent of the lessor, it appears that the lessor was on the 4th of December, 1902, the owner of a tract of 1,100 acres, out of which it had carved and leased on the 30th of November, 1901, and 4th of December, 1902, to the Slick Rock Coal Company 306 acres, with the right to work all seams of coal thereon at a certain royalty, and it then proceeded to lease to James A. Henchey the rest of the 1,100 acres, excepting the part leased to the Slick Rock Coal Company, on exactly the same terms of royalty upon which it by the supplemental agreement of the same date had leased all the coal on the 306 acres to the Slick Rock Coal Company. The appellee, the New Pocahontas Coal Company, is the successor or assignee of the rights of the Slick Rock Coal Company, and is entitled to assert all the rights of the Slick Rock Coal Company.

Subsequent to these agreements of the 4th of December, 1902, the Pocahontas Thin Vein Coal Land Company conveyed all its property in McDowell county to the said James A. Henchey, who subsequently conveyed to the appellant, the Standard Pocahontas Coal Company. After the conveyance to the Standard Pocahontas Coal Company, that company put down a shaft on its own lands (outside of the boundaries of the 306 acres, leased to the appellee) which at a depth of about 360 feet found a thick and valuable seam of coal, called the Pocahontas No. 3 seam, and thereupon the appellant undertook to mine coal in that seam, underneath the surface of the 306 acres, claiming that the two agreements between the Pocahontas Thin Vein Coal Land Company and the Slick Rock Coal Company of November 30, 1901, and December 4, 1902, gave the right to the Slick Rock Coal Company and its assigns to mine only the seam of coal known as the Tug River seam of coal, and did not give it the right to mine any other seams, the right to mine which had been reserved by the Pocahontas Thin Vein Coal Land Company, and by that company was subsequently conveyed to James A. Henchey, and from him to the appellant, the Standard Pocahontas Coal Company.

It further appears from the evidence that at the time of the lease of November 30, 1901, James A. Henchey, together with his brother-in-law, Mark Packard, owned all the stock in the Pocahontas Thin Vein

Coal Land Company, and that James A. Henchey was also at that time the vice president of and the owner of about one-fifth of the stock of the lessee, the Slick Rock Coal Company, and knew all the circumstances of the case, and was well acquainted with the terms of the agreements. Henchey subsequently parted with his interest in the lands leased to the Slick Rock Coal Company by the sale by that company of its rights to the appellee, and the case presents, therefore, the position that Henchey, aware of all the facts, having parted with all his interest in the lease to the Slick Rock Coal Company to the 306 acres, took a lease to himself from the Pocahontas Thin Vein Coal Land Company, owned wholly by himself, and his brother-in-law, Packard, under which appellant now claims the right to all other seams of coal under the 306 acres, except the Tug River coal seam.

In the opinion of the court, the proper construction of the two agreements between the Pocahontas Thin Vein Coal Land Company and the Slick Rock Coal Company dated the 30th of November, 1901, and the 4th of December, 1902, gave to the Slick Rock Coal Company and its assignees the right to work all seams of coal under the 306 acres, and the subsequent agreement between the Pocahontas Thin Vein Coal Land Company and James A. Henchey passed to James A. Henchey and his assigns no right to work any coal seams within the limits of that 306 acres. Upon this point the decree of the court below is in the opinion of this court fully justified.

[2] It is, however, claimed by the appellant that the Slick Rock Coal Company and its successors in the title never having made any effort to discover the existence of, and to operate, any seams of coal on the 306 acres underlying the Tug River coal seam, and having failed to do so for more than 13 years, must be considered as having abandoned all right to operate the same, and such an abandonment constitutes in equity a bar to its claim thereto, especially in view of the fact that the appellee and its predecessors, with full knowledge of the facts, stood by and permitted this appellant to develop and operate the lower coal seam, called Pocahontas No. 3 seam. Assuming, for the purposes of the discussion, that where land containing coal is leased for coal mining purposes, the failure of the lessee to effectuate the purposes of the lease and utilize the rights given to him may, where there is nothing in the lease or the circumstances to show otherwise, be construed as having abandoned the lease, yet the testimony in the present case does not justify such an inference.

There are no facts inferable from the testimony justifying an estoppel in pais as relied upon by the appellant here, when it says that the appellee stood by and permitted the appellant to develop and operate the other coal seam, and expend thousands of dollars in such development. The evidence shows that the shaft driven by the appellant, by the driving of which it claims was discovered the lower and underlying seam called Pocahontas No. 3—this shaft was driven wholly on its own lands, and there is nothing in the testimony to charge the appellee or its proper officers or agents with any knowledge that through this shaft the appellant was working or claiming to work another seam of coal within the limits of the 306 acres. The shaft

was driven on the lands of the appellant, where they certainly had a right to drive it, and where neither the appellee nor its officers or agents had any right to inspect or know what was being done. There is no evidence that charges them with that actual knowledge. To permit a furtive and concealed trespass of this kind to operate as notice would be contrary to the principles of what is held in law to be necessary to bar one by knowledge.

This leaves the question simply whether the nonuser or nonworking by the appellee of any other seam of coal than that known as the Tug River seam of coal can be considered to be an abandonment, because it was not or had not been worked up to this time, or rather up to the time of the filing of the bill of complaint herein. Under the original lease the Slick Rock Coal Company and its successors had 30 years within which to mine the coal, for coal-mining and coal-coking purposes. There is no evidence to show that at any time they have not been diligently mining the coal, nor to show that at any time any complaint has been made by the lessor against them for not mining with due diligence, nor any objection made to the insufficiency of the royalty paid and the requirement that they mine up to the coal capacity. So far as the evidence shows, there has been an entire acquiescence by the lessor, the appellant, in the amount of mining done by the Slick Rock Coal Company and its successors, and in the amount of royalty paid, and no demand seems to have been made for any greater mining. Under these circumstances the court is constrained to hold that there is no sufficient testimony upon which a conclusion of abandonment could be based, and that the decree below should be affirmed.

Affirmed.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes