**ALABAMA VERMICULITE CORPORA-TION, a corporation, Petitioner,**

**v.**

**J. T. PATTERSON, W. A. Patterson and T. M. Patterson, Respondents.**

**Civ. A. No. 1313.**

United States District Court
W. D. South Carolina,
Greenville Division.

April 23, 1955.

Alfred F. Burgess, of Wyche, Burgess
& Wyche, Greenville, S. C., for petitioner.

E. P. Riley, Greenville, S. C., Robert L. Gray, Laurens, S. C., for respondents.

WILLIAMS, District Judge.

This action was originally instituted in the United States District Court for the Western District of South Carolina on September 4, 1952, by Alabama Vermiculite Corporation against J. T. Patterson, W. A. Patterson and T. M. Patterson, for a declaratory judgment under Title 28 U.S.C.A. §§ 2201 and 2202, adjudicating the rights and liabilities of the parties under a lease for the mining of vermiculite ore, dated May 22, 1951 and for specific performance thereof.

On April 20, 1954, after trial of the issues, this Court handed down an order which held in substance that the petitioner had not breached said lease as contended by respondents but on the contrary that the respondents had failed and refused to perform the obligations thereby imposed upon them and that by reason thereof, petitioner, Alabama Vermiculite Corporation, was entitled to exclusive possession of the premises for the purpose of mining vermiculite ore in accordance with Paragraphs 4, 5 and 6 of the lease agreement.

The Court retained jurisdiction of the cause for the purpose of enforcing compliance with the terms of its order.

This order became final on June 14, 1954, when a consent order dismissing respondents' appeal was signed by the Court. See Alabama Vermiculite Corp. v. Patterson, D.C., 124 F.Supp. 441.

Thereafter, plaintiff went into possession and between the middle of September and the first of November, mined 24 carloads of ore from the premises, tendering the respondents payment therefor at the rate of 75 cents per ton for each ton mined. The respondents refused to accept said sum in payment and by letter dated November 4, 1954, advised the petitioner that it had breached the lease by failure to pay a premium on ore where the yield from one ton of merchantable vermiculite exceeded forty (40) bags per ton.

Alabama Vermiculite Corporation by letter dated November 12, 1954, denied that the provisions of the lease with respect to payment of a premium in the event the yield should exceed 40 bags per ton applied where lessee had been put into possession and was mining after breach of the lease by lessor.

After exchange of this correspondence between the parties, petitioner mined two additional cars in December of 1954.

Thereafter, on December 13, 1954, Alabama Vermiculite Corporation brought this proceeding to determine whether the provisions of Paragraph 2 of the lease providing for payment of a premium if the merchantable vermiculite ore from one ton should exceed 40 bags per ton is applicable to and binding upon petitioner-lessee after it has been put into possession following a breach by respondent-lessors.

Respondents filed an answer alleging in substance that said provision is applicable under the circumstances and also alleged that the petitioner had committed waste with respect to the ore and timber on said land.

Subsequently, on February 21, 1955, the Alabama Vermiculite Corporation filed a supplemental verified petition upon which this Court issued a rule to show cause against the respondents, returnable on March 3, 1955, as follows:

1) Why the respondents should not be enjoined from occupying or exercising any control over the premises and from interfering in any way with petitioner's right to exclusive possession of said premises under the order and lease hereinabove referred to; and

2) Why they should not be ordered and directed to forthwith deliver exclusive possession of said premises to petitioner; and

3) Why respondents should not be adjudged in contempt of Court for failure to carry out the terms of the order of April 20, 1954.

During the February term of Court for the Greenville Division, a pre-trial conference was held before me at Green-

ville, South Carolina, on February 26, 1955, at which time counsel for petitioner and respondents were present. At this conference, by agreement of counsel, it was decided that the Court would determine the following questions:

I. Do the provisions of the lease relating to premium payments apply where the lessee is in possession and mining under the terms of the lease because of a breach by the lessor?

II. Have the respondents delivered to petitioner exclusive possession of the premises for the purpose of mining vermiculite ore in accordance with the order of the Court dated April 20, 1954?

It was agreed that the Court would determine the first issue upon the written lease itself and the second issue upon affidavits to be submitted on behalf of petitioner and respondents. Both parties have submitted affidavits on the second issue and written briefs upon both issues, upon which the Court bases this order.

I. Do the provisions of the lease relating to premium payments apply where the lessee is in possession and mining under the terms of the lease because of a breach by the lessor?

After certain formal recitals of the desire of the respondents "to convey their rights to the vermiculite ore that may be removed from the premises" and the desire of the petitioner "to purchase the vermiculite ore, which may be located upon said premises", Paragraph 1 of the lease states that "the lessors do hereby grant unto the lessee the *exclusive* right to go in and upon the lands hereinafter described and mine therefrom vermiculite ore for a period of five years" with the right of renewal for an additional five-year period.

In Paragraph number 2, the parties agreed upon a price of 75 cents per ton of unprocessed vermiculite, or the prevailing market price. In this same section, Alabama Vermiculite Corporation, the lessee, appoints the respondents, the lessors, its agent to mine vermiculite ore from the demised premises and load the same on railroad cars at Lanford Station, South Carolina, for which they were to receive 75 cents per ton for the raw ore and $4 per ton for their work in mining and loading the same, railroad weights to be accepted in computing the tonnage. This paragraph then contains a penalty provision if the lessors should deliver ore which exceeded an allowance of 10% for moisture and 10% for other waste materials. If this is done, the lessee may reduce the price to be paid proportionately. This same paragraph then gives the lessors a premium if the yield of merchantable vermiculite from one ton of ore should exceed forty bags per ton.

It will be seen from a reading of this paragraph that it relates solely to the situation where the lessors are mining the vermiculite as agents of the lessee. All the provisions relating to ore specifications, that is the moisture allowance, the allowance for waste material and the provisions regarding yield, are contained in this paragraph of the lease which relates to conditions under which the lessors are mining as agents for the lessee.

The parties obviously intended that the lessors, as agent for the lessee, should be required to deliver ore to the railroad cars, meeting minimum specifications, that is to say, ore having not more than 10% moisture content and 10% waste material. The petitioner-lessee was required to pay freight charges as well as extraction costs. These are very large and important factors in the mining of vermiculite ore. In the absence of such a provision, petitioner might be required to pay for mining and shipping material from which it could derive a very small quantity of merchantable vermiculite. By the same token, if the lessors delivered a higher quality of unprocessed vermiculite ore from which a yield in excess of 40 bags per ton could be obtained they were to receive premium compensation for their competency and industry in mining and loading said ore.

The provisions in paragraph 2, (a) for a reduction in price if lessors should mine

and ship ore which contained more than 10% moisture and 10% waste, and (b) for a premium in the event the yield from one ton of ore should exceed 40 bags per ton, on one hand were intended to prevent the respondents while they were mining as agents from shipping ore with a large percentage of waste, and on the other hand, to encourage them to mine and ship vermiculite in its purest form, free from moisture and foreign substances. It will be remembered that at the trial in the first instance on November 9 and 10, 1953, respondents contended that they had a legal right under this paragraph of the lease to mine and ship ore of any quality whatsoever and that petitioner was required to pay them at the rate of $4 per ton for mining a substance which petitioner could not use. The Court declined to follow respondents' contention in this respect.

We now come to the provisions of Paragraph Number 5 of the lease which relate solely to the situation where petitioner-lessee is mining after breach of the lease by the respondents-lessors. In said event, the lessee is given "the right to mine and remove such deposits of vermiculite ore as may exist upon said premises during the term before mentioned, *paying therefor seventy-five (75¢) cents per ton or the market value,* whichever may be greater as hereinbefore stated, for such unprocessed vermiculite ore as may be removed." This paragraph is silent as to any minimum specification for moisture and waste material or for premium for a higher yield than 40 bags per ton. If the respondents failed or refused to perform the services called for in Paragraph 2 of the lease and the lessee was compelled to perform the same because of lessors' default, it was not intended that lessee should be permitted under the provisions of Paragraph 4 to reduce the amount to be paid for the vermiculite ore because the moisture content exceeded 10% or because there was more than 10% of waste. Neither was it intended that the lessee would be compelled to pay a pre-mium if because of its efforts the yield from the ore exceeded 40 bags per ton.

In other words, when petitioner-lessee is mining under Paragraph 4, after breach by respondents-lessors, there is no occasion for such a restriction on the one hand or premium on the other. Under these circumstances, petitioner cannot deduct from the purchase price because of excess of moisture and waste, nor are respondents entitled to a premium if the yield exceeds 40 bags per ton for one ton of ore. The language of Paragraph 4 of the lease under these circumstances applies. It is clear and unambiguous, requiring petitioners to pay for the ore mined only "75¢ per ton or the market value."

To construe the lease to permit the respondents to read the provisions of Paragraph 2 into the provisions of Paragraph 4 would be in effect permitting them to profit from their own wrong. It is not difficult to see that testing for yield and the making and furnishing of reports thereon would entail considerable expense on the part of the lessee and that it should not be required to do so unless the terms of the lease clearly so provide. This Court, although not emphasizing the exact point as clearly as is now being attempted, inferentially reached the same conclusion when by its order of April 20, 1954, it, among other things, made the following findings of fact that provided as follows:

"The lease further provided that should the lessors fail and refuse for any reason to mine the ore, the lessee should be permitted to mine for his own account and should have such rights together with the right-of-way for ingress and egress and the right to construct necessary mining equipment, with exclusive right to possession of the premises during the mining by lessee. Lessee agreed in such event to pay Seventy-five Cents (75¢) per ton for all ore mined by him.

\* \* \* \* \*

"It is ordered that the defendants be and they are hereby ordered and

directed to forthwith deliver to the plaintiff exclusive possession of the following described real estate for the purpose of mining vermiculite ore in accordance with the provisions of Paragraphs 4, 5 and 6 of the lease agreement, entered into by the defendants and R. M. Biddle on May 22, 1951, and assigned to plaintiff and that plaintiff pay to the defendants the price per ton for said unprocessed vermiculite ore in accordance with the terms of said lease agreement."

◼ The legal principles involved in determining this issue require merely an application of the settled rules of construction of agreements to the particular document. Mining leases are construed the same as other leases, the object being to determine the intention of the parties from the entire instrument.

The Rule is stated in 36 American Jurisprudence at page 310 as follows:

"Such leases [mining leases] in and of themselves are entitled to no different construction than is given ordinary leases, and receive much the same interpretation as is given leases of oil and gas. The intention of the parties is controlling, and where they express their rights and obligations in unambiguous terms, the courts will construe the instrument according to its plain and unequivocal meaning."

The same rule was announced in the case of Adkins v. Adams, 7 Cir., 1945, 152 F.2d 489. In that case, the mining lease demised a piece of property with the right to mine coal and other mineral substances therefrom. Coal was being mined at the time of the lease but during its term, oil was discovered on the property. The question was whether the lessee had the right to remove the oil. The Court held that it did, saying, at page 491:

"The intention of the parties is to be ascertained from the entire instrument and not from detached portions, it being necessary to construe all its parts in order to determine the meaning of any particular part as well as of the whole."

◼ The application of the above rule to the present lease leads the Court to the conclusion from the language of the entire lease that the provision relating to yields was not intended to apply where the lessee was mining because of the breach of the lease by the lessors. The Court's conclusion that this provision is inapplicable obviates the necessity of lessee's keeping a record of the yields and making reports of the merchantable vermiculite per ton derived therefrom.

II. Have the respondents delivered to petitioner exclusive possession of the premises for the purpose of mining vermiculite ore in accordance with the order of the Court dated April 20, 1954?

Much of the evidence submitted by the respondents, the Pattersons, deals with facts and transactions which occurred prior to the Order of the Court in the first trial, dated April 20, 1954. For example, a large part of the affidavit of R. M. Biddle deals with transactions during that period and throws no light on the specific issue now before the Court.

In addition, much of the evidentiary matter contained in the affidavits of respondents' witnesses deals with the question of waste. Although this issue was raised in respondents' answer to the petition of September 13, 1954, counsel at the pre-trial conference announced that they wished to amend the answer by eliminating this claim from the present suit. A large part of these affidavits are, therefore, not material to the two specific issues now before the Court.

This Court by its order of April 20, 1954, held as a matter of fact and law (1) that petitioner had not breached the lease; and (2) that respondents had failed to perform the obligations imposed upon them thereby. By reason of respondents' default, this Court directed them,

"* * * to forthwith deliver to the plaintiffs *exclusive possession* of the following described real estate for the purpose of mining vermiculite ore in accordance with the provisions of paragraphs *4, 5 and 6* of the lease agreement * * *". (Emphasis added.)

Then followed a description of the real estate by acreage, by boundaries, by chain of title and by metes and bounds.

The Court retained jurisdiction of the cause for the purpose of enforcing compliance with the terms of said order.

Some time was required for petitioner to assemble the necessary men and equipment to resume operations. As soon as it did, respondents, individually and collectively, began interfering with the agents, servants and employees of the petitioner in the exercise of their mining rights under the lease and Court order. The evidence shows that the respondents did the following things:

(1) Required Lloyd L. Marshall to furnish them with a letter showing his authority before they would permit him to enter the premises, although he, along with R. W. Sterrett, vice-president of Alabama Vermiculite, had gone to the premises a week prior thereto for the purpose of introducing Marshall to the Pattersons and explained his position and authority. The respondents were not justified under the circumstances in taking this position. The incident caused considerable delay in petitioner's mining operation.

(2) In September of 1954, respondents interfered with the petitioner when Marshall set about relocating the road leading from the mine to the public highway, asserting the right to control the location of the roads and to direct petitioner's agent where to locate the same. Paragraph 4 of the lease delineating lessee's rights in mining the deposit gave petitioner full right of ingress and egress to the property "with the right to construct, maintain and use roads, tramways, railroads, siding, chutes, flumes and rights of way on and over the said property * * *". The affidavit of T. M. Patterson, one of the respondents, justifies this action on the basis that "at that time Mr. Marshall agreed to use the old road and not cut a new one across the farm land * * *". The point is that respondents had no right to exact an agreement on the part of the petitioner as to the location of the road. This unwarranted interference with the rights of petitioner under the lease occasioned considerable additional delay.

(3) On October 26, 1954, petitioner commenced the exploration of the leased premises for the purpose of locating the ore bodies thereon and determining the quality of the same so that it might properly and intelligently mine the property under the lease. Not owning proper equipment for this purpose, petitioner hired men and machinery from the Zonolite Company. When the drilling equipment and operators went on the premises, respondents appeared on the scene demanding that they be removed immediately. Their words and actions were such as to indicate that physical violence would result if their demands were not met. Petitioner was well within its rights in contracting with Zonolite Company for this work under the circumstances and respondents were unwarranted in their position and action in this regard. T. M. Patterson, one of the respondents, seeks to justify this position by stating in his affidavit, "that he (Marshall) furthermore agreed that no person working for the Zonolite Corporation would be allowed on the premises and that no equipment owned by the Zonolite Corporation would be permitted on the premises". The point is that the respondents had no right to exact such an agreement on the part of the petitioner. On the contrary, petitioner has the right under the lease to take persons working for the Zonolite Company on the premises and/or to use equipment owned by the Zonolite Company if petitioner deems such action reasonably necessary in connection with their mining under the lease.

Petitioner could not, however, assign the lease without the written consent of the respondents-lessors as provided in Paragraph 7 of the lease.

Respondents' action in connection with the drilling was without justification and caused considerable additional delay and seriously interfered with the rights of the petitioner under the lease and Court order.

(4) The deposit which petitioner commenced mining after the April 20th order was the one respondents had been mining prior to the time they broke the lease. As a result of the drilling hereinabove referred to, at least one other deposit was located which was of a higher quality than the first deposit mined. The evidence on behalf of petitioner shows that the quality of ore demanded by the market varies from time to time, based to some extent on the purpose for which the ore is to be used. Petitioner moved its men and equipment to this later discovered deposit on February 4, 1955 and commenced stripping the area for the purpose of mining. It so happened that trees were on this area. It was necessary to remove them and strip the topsoil to such depth as would expose the vein of ore so that it could be mined. Respondents thereupon appeared on the scene, demanded that petitioner immediately cease stripping said area and refused to allow petitioner to mine this new deposit. In justification for this action, respondents contend that petitioner cannot, under the terms of the lease, mine from more than one deposit at the same time and that it is required to mine solely from the deposit opened by the Pattersons while they were in possession of and mining the premises under the lease. The Court finds that petitioner was justified in opening this new vein and mining therefrom as its business demands necessitated. Furthermore, respondents are not justified in the position they have taken with respect to this deposit, and their action constituted an unwarranted interference with the rights of the petitioner under the lease and occasioned considerable additional delay.

(5) The incident when an axle on one of petitioner's trucks broke while loaded with vermiculite from the mine, making it necessary to dump the load in order to remove and repair the truck, further illustrates respondents' unjustified interference with the rights of the petitioner under the lease and Court order.

The preamble of the lease expresses the desire of the lessors to convey to the lessee their rights to the vermiculite ore that may be removed from the premises and the desire of the lessee to purchase the ore "which may be located upon said premises". There is no restriction on the quantity of ore that can be mined by the lessee. The words in the lease are clear and unequivocal. They lead the Court to the conclusion that petitioner may mine one or more of the vermiculite deposits on the leased premises at the same time or one deposit at one time and another deposit at a different time, according to its market requirements.

The attitude of the respondents on the occasions when they came in contact with petitioner's employees, and particularly with Lloyd L. Marshall, its superintendent, was both oppressive and belligerent and the Court can readily understand that Marshall was put in fear for his own safety. These incidents are cited to show that respondents have since petitioner commenced mining operations in September, 1954, continuously and persistently harassed, threatened and intimidated petitioner's agents to such an extent that they are unable to perform their duties properly.

It is natural to expect that respondents were disappointed with the outcome of the first trial, resulting in this Court's order of April 20, 1954. It is apparent, however, that they have not accepted the order in good faith with the intention of abiding by its terms. Their actions rather indicate that they intended to so harass and intimidate petitioner's employees to such an extent as to prevent

it from enjoying the rights to which it is entitled under the lease and this Court's order.

If there is as much vermiculite ore on the premises as is indicated in one of respondents' affidavits, the Court cannot understand why they are not desirous of having petitioner remove as much of it as possible under the lease. Certainly it would be to their financial advantage for petitioner to do so.

In connection with the point now under consideration, reference is made to paragraph 6 of the lease which reads as follows:

> "6th. In the event it should become necessary for the lessee to mine said vermiculite ores by reason of the Lessors failing or refusing to act as his agents for that purpose, it is understood and agreed that *the Lessee shall have the exclusive right of possession of said premises during the time the mining operations are conducted thereon,* and that he may remove such top-soil, timber fences, and any and all other obstructions which might in any way impede the Lessee in the mining, storing or removal of vermiculite ore from the leased property." (Emphasis added.)

The language of this paragraph is clear and unambiguous. Under it, lessee is entitled to "the exclusive right of possession of said premises" since it has become necessary for lessee to mine the vermiculite by reason of lessors' failure or refusal to do so.

*London Extension Mining Co. v. Ellis,* 10 Cir., 1943, 134 F.2d 405. The lease in this case granted to the lessees the right to prospect and mine a dump commonly known as the American Dump and to extract ore therefrom and provided that the lessees should pay to the lessors as royalty 20% of the net smelter returns on all ore extracted and sold from the premises. The Court, speaking through Circuit Judge Phillips, at page 410 of the report says:

> "Mining leases confer upon the lessee the exclusive possession of the deposits and the right to remove and reduce the ore to ownership."

The following cases are cited as authority for this principle of the law: Lynch v. Alwroth-Stephens Co., 267 U.S. 364, 369, 45 S.Ct. 274, 69 L.Ed. 660; Ewert v. Robinson, 8 Cir., 289 F. 740, 746, 747, 35 A.L.R. 219.

The lease in the Lynch case, supra, ran for a period of fifty years and obligated the lessee to mine a minimum quantity of iron ore annually and to pay the lessor, owner of the fee, a royalty of 30 cents per ton upon each ton of ore extracted. The Court held that this lease vested in the lessee the exclusive possession of the ore deposit with the right of removing the same and reducing it to ownership.

At page 275 of 45 S.Ct., Mr. Justice Sutherland, speaking for the Court, says:

> "It is, of course, true that the leases here under review did not convey title to the unextracted ore deposits (United States v. Biwabik Mining Co., 247 U.S. 116, 123, 38 S.Ct. 462, 62 L.Ed. 1017); but it is equally true that such leases, conferring upon the lessee the exclusive possession of the deposits and the valuable right of removing and reducing the ore to ownership, created a very real and substantial interest therein. See Hyatt v. Vincennes Bank, 113 U.S. 408, 416, 5 S.Ct. 573, 28 L.Ed. 1009; Ewert v. Robinson [8 Cir.], 289 F. 740, 746–750 [35 A.L.R. 219]. And there can be no doubt that such an interest is property. Hamilton v. Rathbone, 175 U.S. 414, 421, 20 S.Ct. 155, 44 L.Ed. 219; Bryan v. Kennett, 113 U.S. 179, 192, 5 S.Ct. 407, 28 L.Ed. 908."

The findings of fact and conclusions of the court in the case of Standard Pocahontas Coal Co. v. New Pocahontas Coal Co., 4 Cir., 1918, 252 F. 535, are controlling in this case, although the lease referred to therein is not as clear and

unambiguous as the one now under consideration. In that case, the agreement leased for coal mining and coal coking purposes only a tract of land in McDowell County, West Virginia, containing 306 acres and giving the particular metes and bounds and courses of the land. The lease then contained certain provisions with reference to one seam known as the Tug River seam of coal. A supplemental agreement was entered into whereby the limitation inserted in the first agreement, confining the lessee to working the seam known as the Tug River seam, was entirely withdrawn and obliterated. The Court held that the limitation inserted in the first agreement confining the lessee to working only one seam was entirely withdrawn and obliterated by the supplemental agreement and the first agreement was therefore left as if the unlimited grant of the right to mine coal upon the entire 306 acres was left to the lessee in an unlimited manner; that is, that the lessee could mine *any and all* seams of coal on the land leased.

In the instant case, the lease is uncomplicated by any supplemental agreement. It grants to the lessee under the situation which now prevails the exclusive right of possession of the premises.

In 24 Am.Jur. at page 546 relating to oil and gas leases, it is said:

" * * * It is agreed in virtually all jurisdictions that such an instrument [oil lease] confers upon the lessee an exclusive right to enter upon the land within the time limited, conduct his exploratory operations thereon for the term conceded, and extract the gas and oil therein until they become exhausted."

Cited to the text of the above quotation is Kidwell v. General Petroleum Corp., 212 Cal. 720, 300 P. 1, 3, 76 A.L.R. 830. In this case, an oil and gas lease granted to the lessee the sole and exclusive right of prospecting and drilling the demised premises and removing oil and gas therefrom with the right to maintain roads, appurtenances, buildings, etc.

A number of wells were drilled to a depth of 3,500 feet and oil in paying quantities was removed from the wells. Later, wells were drilled to a much greater depth than the 3,500-foot level and a new oil sand was discovered from which large quantities of oil were removed by the lessee. The lessor filed suit against the lessee for the value of all oil removed from the lower stratum on the theory that the lease covered only oil that was known to exist at the 3,500-foot level at the time the lease was made.

The Court construing the terms of the lease held in favor of the lessee. It was said:

"The deed to plaintiffs, executed by their grantors, conveyed to plaintiffs not only the surface of said lands but everything of value beneath the surface whether known or unknown to the parties at the time of its execution. So with plaintiffs' lease to the defendant. It expressly demised and let to the defendant the exclusive right to drill for oil and gas upon the land of the plaintiffs. As this right was subject to no limitation, it necessarily carried the right to any and all deposits of oil and gas lying beneath the surface of the soil whether known or unknown at the date of the execution of the lease. The minds of the parties did meet upon the production of all oil and gas lying beneath the surface of the soil irrespective of the depth at which said oil and gas might be found, and irrespective of the fact that at the date of the lease the parties knew oil and gas at that time had been produced only at a depth of 3,500 feet or less."

While the above case is an oil and gas lease, the principle is the same as a mining lease. The application of the principle to the present lease would mean that the lessee would have a perfect right to remove any vermiculite ore discovered by it that was on the leased premises and could not be limited to ore known to exist at the time the lease was entered into.

The nearest case in point on petitioner's right to open more than one pit ap-

pears to be Trout v. McDonald, 1876, 83 Pa. 144. In that case the plaintiff's deceased husband granted to the defendant the "privilege of going on the * * * and taking out all the coal he could reach beneath the surface"; and also, "to work the mine in such manner as to do the least possible damage to the land * * *."

The plaintiff brought an action to restrain the defendant from opening another pit into the leased premises, claiming that the lease contemplated only one such mine opening.

Held it followed that the lease of certain lands for the purpose of mining to the defendant gave that defendant the right to drill as many openings as were necessary.

"If we are right in our construction of the lease, that it applied to all the coal between the points referred to, the right to make the necessary openings to reach it would follow by implication, unless restrained by the express words of said lease. It is conceded that as many test holes may be sunk as may be necessary. Why not as many shafts?"

Ingle v. Bottoms, 1902, 160 Ind. 73, 66 N.E. 160, 162. This was a suit brought to enjoin the lessor from interfering with the construction by the lessee of a railroad switch used to transport coal from the mine pit to the railroad track. The lessee also asked for injunctive relief. The lease granted to the lessee "the right of entering in and upon the lands hereafter described for the purpose of mining coal and of conducting and operating to any extent he may deem advisable," and provided for payment of a certain amount per ton for coal mined. Held that the lessee was entitled to the injunction prayed for since the construction of the railroad switch is reasonable and *necessary for the efficient mining of the minerals beneath the leased premises.* The Court at page 162 of 66 N.E. says:

"It is well settled that, when anything is granted, whatever is necessary or essential to the enjoyment of the grant is also granted. Dand v. Kingscote, 6 Mees. & W. 174; Marvin v. Brewster, 55 N.Y. 538, 14 Am.Rep. 322; Rankin's Appeal, 1 Mona. 308, 16 A. 82, 2 L.R.A. 429; Wardell v. Watson, 93 Mo. 107, 111, 5 S.W. 605; Williams v. Gibson, 84 Ala. 228, 4 So. 350, 5 Am.St.Rep. [368] 371; Bainbridge on Mines, 101, 102; 20 Am. & Eng. Encyc. of Law (2d Ed.) 774. The rights which arise by implication under said rule are only such as are necessary to the enjoyment of the grant. Pettingill v. Porter, 8 Allen, [Mass.] 1, 85 Am.Dec. 671; Barringer & Adams, Law of Mines & Mining, 589. *Under this rule the grant of the right to the coal carries with it as a necessary incident the right not only to penetrate the surface of the soil for the coal, but also to use such means and processes for mining and removing the same from the premises as may be reasonably necessary.* This includes the right to construct such roads and railroad tracks on the surface of the land as are reasonably necessary for the transportation of supplies, machinery for the operation of the mine, and for removing the coal from the mine openings. 2 Lindley on Mines, sec. 813, and authorities cited supra. (Emphasis added.)

* * * * * *

"The rule is that a lease must be construed as a whole, and such construction placed upon it as will render all of its clauses harmonious, consistent, reasonable, and just, and mutually obligatory in its provisions. Exceptions are construed against the lessor and in favor of the lessee. 18 Am. & Eng. Ency. of Law (2d Ed.) 617, 618, 624; 17 Am. & Eng. Ency. of Law (2d Ed.) 4–8, 18; Gear, Land & Tenant, sec. 68."

Stoddard v. Illinois Improvement & Ballast Co., 1916, 275 Ill. 199, 113 N.E. 913, 915, 916:

"In ascertaining the meaning and intent of the lease we are to give

meaning and effect to every clause therein, if possible, and from the whole ascertain what is the real intent. We are to suppose, in the first place, that the lease was given for the mutual benefit of the parties, and that they were not joining in a mere nominal lease and using meaningless words and terms as an idle ceremony."

The Courts of South Carolina, both State and Federal, have not been called upon to consider many questions growing out of the mining industry in general and vermiculite mining in particular. Hence, no decision from South Carolina has been called to the Court's attention which throws any light on the issues now before the Court.

Many of the decisions relate to the mining of coal, gas and like minerals which are mined through what is known as the subterranean or tunnel method. That type of operation would not necessarily require use of the surface of the premises, but it is conceded that a vermiculite operation such as the one involved in this case is properly conducted by a method known as pit mining; that is to say, by removing the over burden from the surface and digging up the vermiculite rather than tunneling underground as is usually done for coal and other subterranean minerals. Furthermore, the construction placed by the courts of other states in connection with minerals mined either by the tunnel method or the pit method depends largely upon the language of the particular lease.

In the case of English v. Harris Clay Co., 225 N.C. 467, 35 S.E.2d 329, an action was brought by the owner of the surface rights in certain land against the owner of the mining rights for damages in removal of surface soil and destruction of superstructures in mining for kaolin, a subsurface mineral. The defendant, conceiving it necessary to the recovery of the mineral took down a house and garage and another small house in order to get to a desired kaolin deposit which was under the same. A judgment of nonsuit was affirmed by the Supreme Court of North Carolina upon appeal by the plaintiff.

The question before the Court was whether or not, in the light of the prevailing method of mining kaolin, the principle of subjacent support was involved. The Court held that the principle did not apply to a situation where minerals were being mined by the pit method and that the defendant was well within its rights in removing the buildings from the surface of the property.

It is worthy of note that in the English case, supra, the surface rights and the mineral rights were owned by different parties, whereas in the instant case, the lessee has exclusive possession of both the surface of the land and the subterranean area. It goes without saying that the lease is for the purpose of mining vermiculite ore and it is the duty of the petitioner to use due care in recovering the mineral so as not to unreasonably injure the defendants' reversionary rights as owners of the property after the expiration of the lease.

The case of Jennings v. Southern Carbon Co., 73 W.Va. 215, 80 S.E. 368, involves a lease which granted to the Carbon Co. the right to mine for oil and gas. It appears that these particular minerals are customarily mined by the subterranean method. In this case, the plaintiff was complaining that the defendant drilled only one well on the property when it knew that this well produced gas in great quantities and at high pressure. She insisted that the defendants should have drilled a number of wells to secure gas for the mutual advantage of the owner and the operator.

Contrariwise, in the case now before me, the defendants are complaining because the petitioner is seeking to open up two vermiculite pits for the purpose of extracting ore therefrom.

The Court held that it was the duty of the operator to drill such number of wells as in the exercise of sound judgment it deemed reasonably necessary to secure either oil or gas or both for the mutual

advantage of the landowner and operator under the lease.

 Likewise, in the instant case, it is the duty of the Alabama Vermiculite Corporation to mine such pits or deposits of vermiculite as is reasonably necessary to secure vermiculite so as to promote the mutual advantage and profit of itself and the lessors. Its judgment as to when and where and how many deposits shall be opened must be given just deference and its judgment is not subject to review unless the same is unreasonable or arbitrary in the light of all the facts and circumstances and the interests of all parties concerned. As heretofore stated, the Court is not called upon to determine whether or not the petitioner has been guilty of waste in this proceeding. It only remains to say that the opening and mining of the two deposits of vermiculite by the petitioner, as disclosed by the evidence, is not unreasonable or arbitrary.

The case of Adams v. Riddle, 1936, 233 Ala. 96, 170 So. 343, 107 A.L.R. 657, cited by the respondents is not germane to the issue now before the Court because of the difference of the language of the two leases. In that case, the lease carried only the possessory rights needful for mining operations and did not carry the usual full and exclusive possession obtaining between landlord and tenant. In the case at bar, paragraph 6 of the lease grants to the lessee exclusive possession of the entire leased premises, thereby vesting in it the usual full and exclusive possession obtaining between lessors and lessees of farm lands or business or residential property. The possession of the lessee under the circumstances is unlimited.

Although some question was made in the pleadings and affidavits as to the right of the respondent, T. M. Patterson, to occupy the dwelling house on the leased premises, counsel for petitioner announced that they were not insisting on the right of possession of this portion of the premises at the present time and the Court therefore finds that the respondent, T. M. Patterson is entitled to occupy said portion of the premises until notice and demand therefor by the petitioner.

 The Court finds that the respondents have not lived up to the terms of its order in the cause dated April 20, 1954, in (1) not surrendering to petitioner exclusive possession of the leased premises and (2) in harassing and intimidating petitioner's employees and thus interfering with petitioner in the enjoyment of the rights to which it is entitled under the lease and former Court order. The Court prefers to assume that such action was prompted through ignorance on the part of the respondents rather than intentional disregard of its order. It is hoped that this decree will serve as a further delineation of the rights and duties of the respective parties and that the respondents will permit petitioner to extract vermiculite ore from the leased premises in accordance with the lease and Court orders. The Court elects, under the circumstances, not to hold respondents in contempt of Court for their unwarranted actions.